Argued and submitted August 26, affirmed November 23, 1994

# STATE OF OREGON,
*Appellant,*

*v.*

# EARLYNNE LOUISE WILL,
*Respondent.*

## (92-1299; CA A80417)

885 P2d 715

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Jesse Wm. Barton, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

LEESON, J.

## LEESON, J.

■ Defendant was indicted for possession, manufacture and delivery of a controlled substance, ORS 475.992, and two counts of endangering the welfare of a minor. ORS 163.575. The trial court granted defendant's motion to suppress "any and all evidence relating to the narcotic" that was obtained from defendant's residence. The state appeals, assigning error to the trial court's granting of the motion to suppress.[1] We are bound by the trial court's findings of historical fact and presume that it made additional pertinent findings that are consistent with its conclusions and that are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991); *see Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We review for errors of law, ORS 138.220, and affirm.

Shortly before midnight on September 25, 1992, three Astoria police officers responded to a domestic disturbance call. They entered the open door of defendant's apartment after requesting permission from an adult woman inside. She identified herself as defendant's mother and explained that she had been called to come pick up defendant's two children, ages 8 and 4. Defendant had been involved in a fight with her boyfriend, and her mother had last seen her being chased down the street by him. The officers noticed what appeared to be fresh blood on an open hideaway bed in the living room and what they recognized as marijuana smoking paraphernalia—a "bong" and a pipe—on a nightstand beside the bed. The officers left to look for defendant and located her a few blocks away. Defendant returned to the area near her apartment but remained with one of the officers while the other two officers went back to her apartment. The officers did not ask defendant for her permission to re-enter the apartment. At the door, which was

---

[1] The document from which appeal was taken is entitled "State's Proposed Findings of Fact and Conclusions of Law" and was entered by that title in the trial court docket on July 8, 1993. We treat it as an appealable order, making the state's appeal timely, because the final paragraph of the document reads: "THEREFORE, IT IS THE ORDER OF THE COURT that any and all evidence relating to the narcotic contained in the residence be excluded from evidence." The trial court entered an "Order Suppressing Evidence" on August 8, 1993. That later document is a nullity, because the trial court lacked jurisdiction over the case when it was entered. *See* ORS 19.033. We note that the later document purported to suppress "all evidence relating to the controlled substances in Defendant's back bedroom."

still open, the officers encountered defendant's eight-year-old daughter and asked her if they could come in. She responded, "Yeah, grandma is in the bathroom." Defendant's mother emerged from the bathroom and was informed that defendant was safe and that the officers were there to seize the "bong" and pipe. The child declared spontaneously that there was more "stuff" in the back bedroom where defendant and her boyfriend were growing marijuana in the closet. In response to the officers' questions, the child expressed familiarity with marijuana and said that defendant smoked it in front of her. The child led the officers down the hall, where they smelled marijuana. Through the open bedroom door, they saw marijuana stems, paraphernalia and packaging materials. One of the officers asked defendant's mother for permission to enter the bedroom. She responded that she did not live there and could not give permission. The officer then asked the child for permission, and she gave it. The officers entered the bedroom and discovered a marijuana grow operation in the closet. Meanwhile, defendant had returned to the apartment. She ordered the officers to leave. They refused and arrested her. The residence was secured, and the officers obtained a telephonic warrant and subsequently searched the apartment and seized the marijuana and related paraphernalia.

The trial court concluded and defendant concedes that the officers' first entry was valid under the emergency aid doctrine.[2] However, the court ruled that the second entry was unlawful and granted defendant's motion to suppress.

■ On appeal, we examine the validity of the warrantless search of defendant's apartment under Article I, section 9, of the Oregon Constitution.[3] As a threshold matter, we note that the officers' re-entry constituted a "search" under Article I, section 9, because defendant had a protected privacy interest in her apartment, and the officers' entry constituted an "intrusion" that permitted observations not available

---

[2] Because the initial entry was lawful under the emergency aid doctrine, *see, e.g., State v. Follett*, 115 Or App 672, 840 P2d 1298 (1992), *rev den* 317 Or 163 (1993), we confine our analysis to the issues raised by the second entry.

[3] Article I, section 9, of the Oregon Constitution, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

from a lawful vantage point outside the apartment. *State v. Rhodes*, 315 Or 191, 196-97, 843 P2d 927 (1992).

■ The Oregon Constitution prohibits warrantless searches, unless police act within one of the exceptions to the warrant requirement. *State v. Stevens, supra*, 311 Or at 126. The state bears the burden of proving the existence of an exception. 311 Or at 126. Here, the state argues that the officers had two legitimate reasons for re-entering defendant's apartment: the "continuing emergency aid/community caretaking situation that had justified the initial entry,"[4] and the consent of defendant's mother or the child.

The emergency aid and community caretaking exceptions are derived from separate lines of cases. *See State v. Bridewell, supra* n 4, 306 Or at 237-39. We treat them independently, despite their fusion in the state's brief. The state argues that the officers' re-entry was justified under the emergency aid doctrine, because the emergency continued until defendant's mother was notified that her daughter was safe. It contends that one of the officers could have remained in the apartment while the others went to look for defendant, and that the officer lawfully would have been able to seize the "bong" and pipe and to hear the child's declarations. Defendant concedes that the domestic disturbance report justified the initial entry, but argues that, when the officers learned that defendant and her boyfriend had left the apartment, the emergency shifted to outside. Defendant adds that, when the officers located her, "an emergency no longer existed anywhere *inside or outside* defendant's home." (Emphasis in original.)

■ The Oregon Supreme Court has recognized the emergency aid doctrine but has not applied it where the facts do not satisfy the threshold requirement that an emergency is a "true emergency."[5] *State v. Bridewell, supra* n 4, 306 Or at

---

[4] The Supreme Court explained in *State v. Bridewell*, 306 Or 231, 759 P2d 1054 (1988), that the emergency exception to the warrant requirement of Article I, section 9, is actually two doctrines: emergency/exigent circumstances and emergency aid. *State v. Follett, supra* n 2, 115 Or App at 676. The state does not rely on the exigent circumstances exception.

[5] In *State v. Follett, supra* n 2, 115 Or App at 680, we defined the contours of the emergency aid doctrine as a set of conditions that justify an exception to the warrant requirements of Article I, section 9:

237; *see also State v. Davis*, 295 Or 227, 240, 666 P2d 802 (1983). Warrantless entry is justified under the emergency aid doctrine by "the urgent need to render aid and assistance within." 295 Or at 238. In this case, any need to render aid or assistance had not only moved outside defendant's apartment, it had dissipated. There was no longer a true emergency to justify the officers' warrantless re-entry of defendant's apartment.

The state also contends that the officers' re-entry was justified by their community caretaking function. It argues that the officers' re-entry was reasonable, because "it would have been heartless" not to have informed defendant's mother that defendant was safe.

■ ■ ORS 133.033 authorizes police officers to perform community caretaking functions and defines those functions as

"(2) [A]ny lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a) The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A) Prevent serious harm to any person or property;

"(B) Render aid to injured or ill persons; or

"(C) Locate missing persons.

"* * * * *

"(3) Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law."

Here, the officers had no right to remain in or to re-enter defendant's apartment on the grounds of preventing serious

---

"(1) The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency." (Footnote omitted.)

harm, rendering aid or locating a missing person. Community caretaking is not a generic function; specific functions of police officers are a matter of statutory law and must be exercised so as to ensure compliance with Article I, section 9. *State v. Bridewell, supra,* 306 Or at 239. The state has not advanced, nor have we found, any statutory authority that would have allowed the officers to re-enter defendant's apartment pursuant to a community caretaking function.

The state next argues that the officers were "invited" to re-enter the apartment by defendant's eight-year-old daughter. It claims that the child's consent was valid authority for the officers to enter. It relies on *State v. Carsey,* 295 Or 32, 39, 664 P2d 1085 (1983), for the proposition that any cohabitant has actual authority to authorize entry by virtue of "generally having joint access or control for most purposes."

In *Carsey,* the Oregon Supreme Court interpreted the Fourth Amendment rule as stated in *United States v. Matlock,* 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974). In *Matlock,* the Court held that common authority to validly consent to a search "rests on mutual use of the property by persons generally having joint access or control for most purposes." 415 US at 171 n 7. The Oregon Supreme Court construed that rule to require that the third party who consents has actual authority. *State v. Carsey, supra,* 295 Or at 44-46. We subsequently found the reasoning of *Carsey* persuasive in determining that Article I, section 9, of the Oregon Constitution also requires actual authority. *State v. Lynch,* 94 Or App 168, 171-72, 764 P2d 957 (1988). Although apparent authority is now sufficient under the Fourth Amendment, *see Illinois v. Rodriguez,* 497 US 177, 110 S Ct 2793, 111 L Ed 2d 148 (1990), actual authority to grant consent is still required under Article I, section 9. *State v. Arnold,* 115 Or App 258, 262 & n 2, 838 P2d 74 (1992), *rev den* 315 Or 312 (1993).

Our analysis begins and ends with our own constitutional provision where, as here, this state imposes a higher standard than is required under the federal constitution. *State v. Davis, supra,* 295 Or at 241 n 18; *see also State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983). The question before us is whether defendant's eight-year-old child actually had common authority to consent to re-entry by the police.

 Before police can enter or search without a warrant in reliance on third-party consent, they must inquire and ascertain whether the consenting party has common authority; they cannot rely on subjective good faith. *State v. Carsey, supra,* 295 Or at 46. Neither we nor the Oregon Supreme Court has ever adopted a *per se* rule regarding a minor's authority to consent to a search of her parent's home. Instead, we have declared that

> "age is *merely one factor* to be considered in determining the scope of the minor's authority to consent and whether the minor's consent was knowing and voluntary." *State v. Scott,* 82 Or App 645, 651, 729 P2d 585 (1986). (Emphasis supplied.)

Cases involving consent by family members pose unique problems, because most household areas are ordinarily subject to common use, although the right to exercise control is inherently a function of the parent-child relationship. *State v. Carsey, supra,* 295 Or at 42. Thus, a minor's actual authority to consent to a search remains a question of fact.

Here, defendant argues that her testimony at trial demonstrated that her daughter had never been given authority to permit anyone to enter the residence. Although it is noteworthy that the testimony was defendant's, that testimony nonetheless is significant for two reasons: first, because the officers did not attempt to determine whether the child had authority to permit them to enter; and second, because it was uncontroverted and is the only evidence regarding the child's authority.

 Additionally, as the trial court concluded, the officers had located defendant and could have sought her permission to re-enter her apartment. In keeping with our rule that a child's consent is not *per se* invalid, we do not suggest that, in all instances, consent must be obtained from the parent when possible. However, in *Scott,* the court noted that the constitutional prohibition is against *unreasonable* searches; its analysis indicated that, because it would be unreasonable to seek consent from a 16-year-old whose parent had refused permission, a resulting search would be unlawful. 82 Or App at 650. That reasoning is even more compelling here, where the police circumvented parental authority and sought consent from an eight-year-old. On the record before us, the state has

failed to meet its burden of proving the existence of the consent exception to allow a warrantless search. Defendant's child did not have actual authority to consent to the officers' re-entry of defendant's residence. We are also unmoved by the state's suggestion that, because an eight-year-old can identify marijuana and has been taught in school that it is illegal, her consent is knowing and voluntary.

 The state next argues that defendant's mother consented to the re-entry, because she had "at least acquiesced to the officer's presence." Consent can never legitimize a search when it is obtained under the pressure of police action that became available only through unauthorized conduct. *State v. Freund*, 102 Or App 647, 653, 796 P2d 656 (1990). In *Freund*, a police officer informed defendant that "he was there to pick up the marijuana and 'he wanted' to do it calmly." We held that consent was not voluntary, because the words used by the officer were unconditional and invited no response other than acquiescence. 102 Or App at 652. Here, the trial court found that, when defendant's mother came out of the bathroom, the officer, who had already entered the apartment, "informed her that he had made contact with the defendant and that he would be seizing the narcotic paraphernalia." As in *Freund*, her acquiescence cannot be held to be voluntary consent.

 Finally, the state argues that the police had probable cause to obtain a warrant based on the observation of the marijuana paraphernalia and the child's declarations. The trial court found, however, that a warrant was not obtained until after the re-entry and the ensuing search.[6] Even assuming that probable cause for a warrant existed after the first entry, the fact that a warrant could have been obtained does not provide authority to conduct a warrantless search.[7]

---

[6] We need not address whether a warrant could have been obtained on the basis of the observation of the paraphernalia after the first entry or whether the paraphernalia could have been seized as part of a plain view search during that first entry. *See State v. Parks, State v. Tarpley, Jr.*, 5 Or App 601, 485 P2d 1246 (1971); *see also State v. York*, 37 Or App 339, 587 P2d 111 (1978).

[7] It is unclear whether the state is making an offhand argument for inevitable discovery. Nevertheless, the inevitable discovery doctrine does not apply to remove the taint from primary evidence obtained during the course of an illegal search. ORS 133.683; *State v. Schellhorn*, 95 Or App 297, 302-03, 769 P2d 221 (1989).

Under Article I, section 9, both physical evidence and testimonial evidence obtained during an illegal search must be suppressed. *State v. Munro*, 96 Or App 238, 243-44, 772 P2d 1353 (1989).

Affirmed.