Argued and submitted November 20, 1998, affirmed February 17, petition for review denied May 25, 1999 (328 Or 594)

STATE OF OREGON,
*Respondent,* ·

*v.*

ROBERT C. BEYLUND,
*Appellant.*

(96C-21481; A100204)

976 P2d 1141

J. Michael Alexander argued the cause for appellant. With him on the brief was Burt, Swanson, Lathen, Alexander & McCann, P.C.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendant appeals a judgment of conviction for the manufacture of a controlled substance. ORS 475.992. He assigns error to the trial court's denial of his motion to suppress evidence and statements obtained during and after a search of a building on his property. We review for errors of law, ORS 138.220, and affirm.

Based on information that defendant was growing marijuana, Officer Bennett drove out to defendant's property with Officer Gilbert to seek consent to search it.[1] The officers drove past a "no trespassing" sign posted beside an open gate on the driveway to reach the house. Neither officer was in uniform. When they knocked on the door, Michael Wicker appeared. The officers identified themselves, mentioned the "no trespassing" sign and asked Wicker if they could be on the property. Wicker said that they could, and he agreed to speak with them. After the officers said they were looking for a marijuana growing operation, Wicker invited the officers to look around the house. He led the officers through the residence, including the basement. Wicker told the officers that he lived on the property and rented it from defendant. Bennett asked to see the other buildings on the property, and Wicker gave him permission. After looking through the other buildings, Bennett returned to inform Wicker and Gilbert that he could smell and hear indications of marijuana growing in the basement of one building (the shop) but that the entry was locked.

In response to Bennett's request to be admitted to the shop's basement, Wicker said that he did not have a key. Wicker then stated that he did have a key, but didn't know where it was. The officers continued to request to be admitted to the basement. A conversation ensued during which the officers at least twice suggested "popping" the door to the basement. Wicker said that the shop was not his property

---

[1] The facts are not in dispute, and we state them as found by the trial court. Where the trial court has failed to expressly articulate a finding, we assume that the facts were decided in a manner consistent with the court's ultimate conclusions, so long as there is evidence in the record to support those conclusions. *State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997).

and that he did not want the door to be damaged. The officers responded that they wanted to "clear the case now" and again asked Wicker to get the key to the door. Wicker, obviously nervous, finally consented to open the building and went unescorted to his bedroom to get the key. He led the officers to the shop and unlocked the door. The officers found a marijuana growing operation inside.

After defendant was charged, he moved before trial to suppress the evidence. Wicker testified at the suppression hearing that he had lived on the property for two to three months and that he had permitted the officers to come on the property and to look around the premises. Also, he testified that he felt coerced when the officers spoke about "popping" the door to the shop. In addition, Wicker said that he had been given a key to the shop to take care of the marijuana for defendant and that was how he earned his "rent." The trial court denied the motion, and the parties agreed to a stipulated-evidence trial. Defendant was found guilty, and this appeal followed.

On appeal, defendant presents two arguments to support his assignment of error that the court erred in denying his motion to suppress. First, defendant contends that Wicker's consent to search the basement of the shop was involuntary. Second, he contends that, even if the consent was voluntary, Wicker did not have actual authority to consent to a search of the shop basement. The state argues that, under the totality of the circumstances, the officers' conduct and their statements to Wicker did not coerce him to unlock the door. The state also argues that the record is more than adequate to support the trial court's conclusion that Wicker had actual authority to consent to the search of the basement.

Under Article I, section 9, of the Oregon Constitution, a warrantless search is *per se* unreasonable.[2] Consent is

---

[2] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

an exception to the rule. *State v. Larson*, 141 Or App 186, 197, 917 P2d 519, *rev den* 324 Or 229 (1996). The state's ability to rely on the consent exception depends on two factors. First, the state must show that the consent was given voluntarily. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). Second, the state must show that a person with actual authority gave the consent. *State v. Ready*, 148 Or App 149, 152-53, 939 P2d 117, *rev den* 326 Or 68 (1997). The burden is on the state to prove the legality of the search by a preponderance of the evidence. ORS 133.693(4).

■ In determining whether Wicker voluntarily gave consent to search, we "examine the totality of the facts and circumstances to see whether the consent was given by [the consenting party's] free will or was the result of coercion, express or implied." *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981). The trial court, in its written opinion, accurately summarized the applicable law:

> "In making this determination, courts are required to draw inferences regarding the person's mental state at the time consent was given. *State v. Johnson*, 120 Or App. 151, 158-159, 851 P.2d 1160, 1165 (1993). Courts also look to factors like whether or not a threat to apply for a lawful search warrant was made, the time and place of the encounter, the number of officers present, the degree of hostility, and whether consent was offered or requested. *State v. Greason*, 106 Or App. 529, 535, 809 P.2d 695, 699 (1991). Additional factors include whether or not the officer's statements invited a response or mere acquiescence, whether physical force was used or threatened, whether weapons were displayed, whether consent was obtained in public, whether the person giving consent was the subject of an investigation, and whether the atmosphere was antagonistic or oppressive. *State v. Larson*, 141 Or App. at 197-198. While these factors are important in determining the level of coercion, consent may be voluntary despite the existence of some coercion. Indeed, not every coercive factor inducing consent to a search is constitutionally impermissible. *Larson*, 141 Or App. at 198; *State v. Jacobus*, 106 Or App. 496, 500, 809 P.2d. 108, 109 (1991)."

■ The conversation between Wicker and the officers was tape recorded. The trial court found that the officer, "on at least two occasions, intimated to Mr. Wicker that perhaps

they would just have to 'pop' the door. They asked him if he wanted them to do that." Defendant argues that in light of those findings and the fact that Wicker was alone on the premises and had not been informed of his right to refuse consent, Wicker's consent was not voluntarily given. However, when the officers' statements about "popping" the door are viewed in context, they appear to constitute a *request* rather than a *threat*.[3] The dialogue demonstrates that the officers sought *permission* to gain access to the shop's basement either by having Wicker unlock the door or by forcing the door open. To the extent that Wicker felt coerced by the officers' presence and questions, he had consented to both by his prior conduct. The officers' statements were a continuation of their earlier request to search, which had been granted,

---

[3] The pertinent portion of the conversation is as follows:

"BENNETT: Okay. Is it alright with you if I force the door to get in there?

"WICKER: Excuse me?

"BENNETT: Is that okay with you?

"WICKER: Oh man, I don't know about that.

"BENNETT: Well, there's marijuana growing in there. I can smell it and I can hear the fans going and the lights going. I mean—let us—you know, we'd like to keep this as low key as possible. We appreciate your letting us come in and talk to you about this. Hey, we understand people are where they're at because of where they're at—we're human—and that's why we're doing this as low key as possible. So what do you know? What do you think? Is it okay with you if I force the door open? Or, is there a way of getting in there without forcing it open? Or do you want to just tell me—

"WICKER: Not that I know.

"BENNETT: Well, how about I just pop it, and—unless you can tell me where—I mean, it's going to damage the door, but that's all it's going to damage, and we'll get the marijuana out of there and we'll deal with it. Is that okay with you?

"WICKER: Shit. It's not really my property.

"BENNETT: Well, I know that, but—it's kinda like—

"WICKER: I don't want to be kicked out of here either, you know.

"GILBERT: Well, I think that's probably going to happen anyway.

"BENNETT: You know, I mean. I don't want to coerce you or anything to do something you don't want to do, but I hate to waste your time and my time.

"* * * * * [conversation about Wicker's last name]

"Just so you know, we're serving eight other search warrants today. This isn't a search warrant. This is just a consent thing, we appreciate your cooperation. * * * So, Michael, I understand you're probably concerned and you're nervous, but I also know you've got a key to that somewhere around here, and so, rather than pop the door, why not just open it and see what we've got, if that's alright with you, okay? In fact, you can open the door for me if you want."

rather than threats to break down the door if Wicker did not cooperate. Under the totality of the circumstances, the trial court was correct when it ruled that the conduct of the officers was not constitutionally impermissible.

The next issue is whether the state proved that Wicker had actual authority to consent. Defendant contends that the officers had to ascertain that Wicker had actual authority to consent *before they requested his permission* to enter the shop's basement. We said in *State v. Will*, 131 Or App 498, 505, 885 P2d 715 (1994), that:

> "Before police can enter or search without a warrant in reliance on third-party consent, they must inquire and ascertain whether the consenting party has common authority; they cannot rely on subjective good faith."

In *Will* we cited the Supreme Court's opinion in *State v. Carsey*, 295 Or 32, 46, 664 P2d 1085 (1983), where it said:

> "Before police can search premises in reliance upon the consent of a third person, they *should* ascertain that the defendant and the consenting party have a common use, access, or control of the premises to be searched. *If they fail to inquire and it later develops* that there was no joint use, access, or control, the subjective good faith of the police will be of no effect. Moreover, *if the police inquire as to such uses before* the search is made, later collusive efforts of the defendant and consenting party to claim there was no joint access, use, or control will be less likely to succeed." (Emphasis added.)

In *Carsey*, the officers were admitted to the defendant's bedroom, over which he had exclusive control, by the defendant's grandmother. The issue was whether the officers' reliance on the grandmother's actions constituted a "good faith" exception to the warrant requirement. The language quoted above is an admonition to law enforcement agencies to ascertain the authority of the person giving consent to forestall subsequent claims that consent was not authorized. Our holding in *Will* does not stand for the proposition that the failure to make such an inquiry will *per se* abrogate a purported consent to search. The question of whether a person has actual authority at the time consent is given is ultimately a question

of law, and the consenting person's relationship to the premises or items to be searched can be proven by facts established after the search.

■     In determining whether a third-party's consent is valid, we consider the relationship of the third party to the premises or the things searched. *State v. Lambert*, 134 Or App 148, 152, 894 P2d 1189 (1995). In *State v. Cook*, 242 Or 509, 515, 411 P2d 78 (1966), the court held that a third party, given permission by the owners to live on the premises for 10 or 15 days while the owners were gone, had authority to consent to a search of the premises. The third party in *Cook* had a key, was caring for the property and had access to all areas, similar to the facts in this case. The court distinguished the facts in *Cook* from a situation where the consent was given by a hotel clerk to enter a hotel guest's room by reasoning that the third party in *Cook* was granted complete control of the premises by the owners while they were gone. Consequently, the court upheld the search based on the caretaker's consent.

Also instructive is the Oregon Supreme Court's reference in *Carsey* to the United States Supreme Court's discussion in *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974):

> "The *Matlock* rule rests upon the premise that one who jointly occupies premises assumes the risk that the co-occupant 'might permit the common area to be searched.' * * *.
>
> "* * * The *Matlock* exception is not a *good faith* exception to the warrant requirement; it is a *consent* exception resting upon the assumption that joint use or occupancy of the premises by the consenting party creates a species of assumption of risk by the defendant that the cotenant might permit the common area to be searched." 295 Or at 44-45.[4]

---

[4] *Matlock* contains the following footnote:

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v United States,* 365 US 610, 5 L Ed 2d 828, 81 S Ct 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v California,* 376 US 483, 11 L Ed 2d 856, 84 S Ct 889 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that *it is*

**4.**     The rationale of *Cook* and *Carsey* applies here; defendant assumed the risk that Wicker would permit others to have access to his property by renting the premises to Wicker. Although defendant correctly points out that access to or use of one area of property does not necessarily imply authority to consent to a search of all portions of the premises,[5] Wicker testified that he had full access to the shop basement and entered it regularly to tend the marijuana plants. There is no contrary evidence. In fact, Wicker paid his "rent" to defendant by tending defendant's marijuana plants there. Under those facts, defendant legally assumed the risk that Wicker, the person he placed in charge of his property, would consent to a search. We conclude that Wicker had a sufficient relationship to the shop's basement and the plants to have actual authority to consent to the officers' search. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

*reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.*" 415 US at 171 n 7 (emphasis added).

[5] *See State v. Wrenn*, 150 Or App 96, 103-04, 945 P2d 608 (1997) (holding that actual authority to consent to search of living room did not necessarily extend to the search of the kitchen).