Argued and submitted July 31, 2000, reversed and remanded January 23, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# CHANCE C. JENKINS,
*Appellant.*

## 9702-31487; A100743

39 P3d 868

James N. Varner argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Lore Bensel, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

WOLLHEIM, J.

---

\* Deits, C. J., *vice* Warren, S. J.

**WOLLHEIM, J.**

Defendant appeals from a judgment of conviction for two counts of robbery in the second degree. ORS 164.405(1)(a). Defendant argues that the trial court erred in denying his motion to suppress evidence found as the result of a warrantless search of a garage located on defendant's parents' property. In particular, defendant argues that the trial court's ruling was based on Measure 40 and that, given the Supreme Court's invalidation of Measure 40 on constitutional grounds in *Armatta v. Kitzhaber*, 327 Or 250, 252, 254, 959 P2d 49 (1998), the trial court erroneously denied his motion to suppress. We reverse and remand.

Just before midnight on February 21, 1997, a masked robber entered the McDonald's restaurant on North Lombard in Portland through the drive-through window and forced the manager, at gunpoint, to obtain money from a safe. A witness flagged down officers Dunlap and Mendenhall, who were driving in the area, to report the robbery. Dunlap left the car and walked towards the restaurant to investigate. As he was walking, Dunlap saw a person come out of the restaurant wearing a light blue or teal athletic jacket with white stripes on the sleeves with the hood up. The person ran from Dunlap, and Dunlap gave chase but eventually lost sight of the person. Dunlap stopped the chase and set up a perimeter. Dunlap was then rejoined by Mendenhall. Both officers were walking within the perimeter when they encountered defendant in his backyard. Defendant was wearing a t-shirt and jeans, was breathing fast, and was sweating. He told the officers that they had scared him. Defendant also told the officers that he had heard some noises and had seen a person running through his back yard. After checking defendant's identification, the officers continued their investigation.

Thereafter, the police brought in a dog to track the perpetrator. The tracking dog led the officers to a house at 7610 North Westanna Avenue,[1] the address where Dunlap and Mendenhall had encountered defendant earlier. Apparently concerned that the robber might be inside the house,

---

[1] Defendant's parents own the house.

several officers went to the door and knocked. Defendant's father, who had been sleeping, answered the door. The officers explained that the nearby McDonald's had been robbed and that they were looking for a suspect who may have been inside the home. The officers asked defendant's father if they could come inside to see if there was, in fact, an intruder. Defendant's father agreed. The officers started down the hall, where they met defendant's mother. The officers told defendant's mother about the robbery and that they were looking for an intruder. The officers then came to the door of defendant's bedroom and asked to whom it belonged. Defendant's mother told them that it belonged to their son (defendant). The officers then opened the door and searched defendant's bedroom.[2]

An officer then asked defendant's father if they could look inside the garage. Another officer asked if defendant's father had a key to the garage. Defendant's father grabbed a key off of a hook by the back door and unlocked the door to the garage. The officers entered the garage and turned on the lights. At that moment, defendant stood up from behind a large tool box. Defendant told his father to tell the police to get out of the garage. Defendant then grabbed his father near the neck or shoulders, and the officers handcuffed defendant and placed him in a police car. At about the same time, Officer Berry, who had stepped past defendant to make sure that no one else was in the garage, saw and picked up a jacket matching the description of the jacket worn by the robber.

At that point, the officers decided to request consent from defendant's parents before they searched the garage any further. The officers presented defendant's parents with a consent form and explained what it involved and what it meant if they signed it. Defendant's mother, after considerable deliberation, voluntarily signed the form, and the officers searched the garage. As a result of that search, the officers discovered certain items of evidence related to the robbery, including a gun, money, a mask, gloves, and a plastic garbage bag.

---

[2] The trial court suppressed the evidence found in defendant's bedroom on the ground that defendant's parents lacked actual authority to consent to that search. Neither party challenges that determination on appeal.

▮▮▮ Before trial, defendant filed several pretrial motions, including a motion to suppress the evidence discovered as a result of the warrantless search of the garage. Among the issues at the suppression hearing was whether defendant's parents had actual authority to consent to the search of the garage. In that regard, the relevant historical facts are as follows:[3] At the time of the robbery, defendant was 18 years old, still in high school, and living with his parents. Approximately one and one-half years earlier, defendant had threatened to move out of the house. Because defendant's parents wanted to ensure that he finished high school, they made a verbal agreement with defendant that he could "have" his bedroom and the garage, thus ensuring that he would stay home but still have a place to entertain his friends. Defendant, in exchange, agreed to contribute $25 per month toward household expenses.

There were two doors to the garage; one large overhead door that rolled up and one small regular sized door, both of which had locks. The garage is connected to the house by a breezeway. Defendant had a key on his key ring to both garage door locks. Neither of defendant's parents carried a key to the garage, but there was an "emergency" garage key hanging on a hook near the back door to the house. Defendant's parents stored some items in the garage. Those items included holiday decorations, power tools, and a large tool box. All other items, such as lawn and gardening tools and supplies, pet supplies, and paint were removed from inside the garage when defendant's parents made the agreement with defendant. Those items were placed in cabinets and storage sheds on the outside of the garage.

At the suppression hearing, defendant's mother testified that she would not enter the garage without defendant's permission, and that the "emergency key"—the key that defendant's father had used to unlock the garage for the

---

[3] We are bound by the trial court's findings of historical fact if there is evidence to support them. *State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). "[I]f the trial court did not make findings on all of the pertinent facts, and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found them in a manner consistent with its ultimate conclusion." *State v. Ready*, 148 Or App 149, 153-54, 939 P2d 117, *rev den* 326 Or 68 (1997).

police—was kept by the back door in case defendant lost or forgot his key. Defendant's father testified that, if defendant was in the garage either by himself or with friends, he would not enter the garage without defendant's permission. Defendant's father further testified that, if he needed something from the garage and knew defendant would not be back for two hours or even two weeks, he would wait for defendant to return to get it.

Based on that testimony, the trial court found that defendant had "the vast majority of the use of the garage."[4] In reaching that conclusion, the trial judge noted that, while he generally believed defendant's parents' testimony that they would not enter the garage without defendant's permission, he thought that defendant's parents were "gilding the lily" in suggesting that they would never enter the garage without defendant's permission. In particular, the trial court noted:

"I asked [defendant's father] a series of questions. Would [he check] with his son if his son were there with four friends? He said he would [check] with his son. I believe him. Would [defendant's father] have checked with his son and knocked on the door before he went in if his son was there by himself? Yeah. I believe him. Would [defendant's father]—if his son was gone for two hours and [defendant's father] needed a chisel would he have waited for his son to get back? He said yes. I don't know if I believe him. By the time we got down to if—if he had—his son was gone for two weeks would he have gone into the garage and he said no, I flat out don't believe him. * * *

"So somewhere in between there, [two hours and two weeks], is where reality lies, okay? Two hours and two weeks. That's what I find * * *[.]"

Thus, the trial court found as a matter of historical fact that, while defendant's parents were the owners of the garage, they had largely ceded control of the garage to defendant. Defendant's parents would typically seek defendant's permission to enter into the garage and, although there were

---

[4] The trial court, in an effort to quantify the relative usage, suggested that defendant had use of the garage 80 percent of the time.

instances where they would enter the garage without defendant's permission, they would never enter without defendant's permission if he was inside the garage. In sum, defendant was the primary user of the garage, and defendant's parents' use of the garage was far less significant.

Following the suppression hearing, the trial court issued a letter opinion in which it denied the motion to suppress after it upheld the constitutionality of Measure 40.[5] Applying Measure 40, the trial court

> "analyze[d] federal law to determine the admissibility of evidence based on the reasonableness of the government's decision to search as assessed by the objective standard of whether the facts available at the moment involved warrant a person of reasonable caution to believe that the consenting party had authority over the premises."

Pursuant to federal law, the trial court denied defendant's motion to suppress "on the limited basis of the federal reasonable belief standard." *See Illinois v. Rodriguez*, 497 US 177, 110 S Ct 2793, 111 L Ed 2d 148 (1990) (under the Fourth Amendment to the United States Constitution, consent of a third party may be valid if it is based on apparent authority). However, the trial court also ruled that "[u]nder Oregon law the motion to suppress would be granted" because defendant's parents "did not have sufficient joint control of the garage to be able to consent to allow the police into the garage." *See State v. Ready*, 148 Or App 149, 153-54, 939 P2d 117, *rev den* 326 Or 68 (1997) (under Article I, section 9, of the Oregon Constitution, third-party consent is valid only if the consenting party has actual authority to consent). Subsequently, the case was tried to the court on stipulated facts. The trial court found defendant guilty of both counts of second-degree robbery.

On appeal, defendant argues that, because Measure 40 was declared unconstitutional, *see Armatta*, 327 Or 250

---

[5] Measure 40 was a "crime victims' rights" initiative approved by the voters during the November 1996 general election. It was "submitted to the voters as an initiated amendment to Article I of the Oregon Constitution [and was] 'designed to preserve and protect crime victims' rights to justice and due process and to ensure the prosecution and conviction of persons who have committed criminal acts.'" *Armatta*, 327 Or at 254.

(multiple constitutional amendments in Measure 40 violated Article XVII, section 1, of the Oregon Constitution), the trial court erred when it denied defendant's motion to suppress based on federal law. That error, defendant argues, mandates reversal of the trial court's decision. The state concedes that the trial court erred in relying on Measure 40 as a basis for denying defendant's motion to suppress. However, the state argues that we should affirm the denial of the motion to suppress on the alternative grounds that defendant's parents had actual authority to consent under Oregon law. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (summarizing the "right for the wrong reason" doctrine). Specifically, the state argues that the trial court's "findings of fact as supported by the evidence in the record demonstrate that defendant's parents had actual authority to consent to the search of the garage." Thus, according to the state, the trial court's findings of historical fact necessarily support the legal conclusion that defendant's parents had actual authority to consent, and therefore the trial court's decision to deny the motion to suppress should be affirmed.

■■ Under Article I, section 9, of the Oregon Constitution,[6] a warrantless search is *per se* unreasonable unless it falls into one of the limited exceptions to the warrant requirement. *Stevens*, 311 Or at 126. Voluntary consent is one such exception.[7] *State v. Beylund*, 158 Or App 410, 414, 976 P2d 1141, *rev den* 328 Or 594 (1999); *State v. Lynch*, 94 Or App 168, 171, 764 P2d 957 (1988). Consent can come from the party claiming the right to privacy, or from a third party with actual authority to give consent. *Ready*, 148 Or App at 152-53.

■■ To determine whether a third-party's consent is valid, we consider the relationship of the third party to the

---

[6] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[7] The trial court found that the consent was voluntary, and neither party challenges that determination on appeal.

premises or the things searched. *State v. Fuller*, 158 Or App 501, 505, 976 P2d 1137 (1999). Under Article I, section 9, the validity of third-party consent turns on whether the consenting party has actual authority to consent. A third party will have actual authority to consent only if he or she has "common authority as shown by that person's 'joint use or occupancy of the premises' before validly authorizing the search." *Id.* at 505, *quoting State v. Carsey*, 295 Or 32, 44-45, 664 P2d 1085 (1983).

■    Here, the parties do not dispute the facts found by the trial court. Rather, the only issue raised by this case is whether, as a matter of law, the historical facts found by the trial court demonstrate that defendant's parents had actual authority to consent to the search of the garage. *Beylund*, 158 Or App at 416-17 (whether person has actual authority to consent is ultimately a question of law). Resolution of that question hinges, fundamentally, on the definition of "common authority," a concept that was described by the United States Supreme Court in *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974):[8]

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States*, 365 US 610, 5 L Ed 2d 828, 81 S Ct 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 US 483, 11 L Ed 2d 856, 84 S Ct 889 (1964) (night hotel clerk could not validly consent to search of customer's room), but rests rather on *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n 7 (emphasis added).

---

[8] Oregon courts have consistently cited *Matlock* in assessing the lawfulness of warrantless consent searches under Article I, section 9, of the Oregon Constitution. *See, e.g., Beylund*, 158 Or App at 417; *Ready*, 148 Or App at 154; *State v. Pearson*, 83 Or App 624, 627, 732 P2d 937 (1987).

Thus, as formulated by the Court in *Matlock*, an inquiry into whether a third party has authority to consent is necessarily fact specific and turns on whether, under the circumstances, the consenting third party has joint access or control over the premises for "most purposes" such that the party against whom consent is sought has effectively assumed the risk that the third party might consent to a search. *Carsey*, 295 Or at 44-45 ("The *Matlock* exception * * * is a *consent* exception resting upon the assumption that joint use or occupancy of the premises by the consenting party creates a species of assumption of risk by the defendant that the cotenant might permit the common area to be searched."); *see also Beylund*, 158 Or App at 418 (applying assumption of risk rationale).

Application of that standard, particularly when it involves parents consenting to a search that affects the rights of their child, is far from mechanical. Typically, in the absence of some special agreement with a child, parents retain "common authority" over all portions of the family residence, regardless of whether or not their child living in their home has some personal expectation of privacy independent of any agreement with his or her parents. But, as courts in Oregon have repeatedly emphasized, neither property ownership nor the existence of a parent/child relationship is, by itself, sufficient to establish the existence of common authority. *See, e.g., Carsey*, 295 Or at 39, 42. Rather, in instances where parents have ceded some measure of control over particular premises to their child, the presence or absence of common authority hinges, necessarily, on the particular agreement between parent and child. *Id.* at 42. Thus, whether defendant's parents had common authority to consent to the search of the garage here turns on their specific agreement with defendant regarding his use of the garage.

■ The evidence adduced at the suppression hearing established the following: Roughly a year-and-a-half before defendant's arrest, defendant was considering moving out of his parents' house. Concerned that defendant might not finish high school, his parents entered into an agreement with defendant that defendant could "have" his room and the garage. Defendant, as part of that arrangement, agreed to contribute $25 per month toward household expenses. After reaching the agreement, defendant's parents moved most of

their possessions out of the garage, but continued to store some items, including power tools and Christmas ornaments, in the garage. If they needed those items, defendant's parents would generally either ask defendant's permission to enter the garage or have defendant retrieve the items for them. Defendant's mother, who signed the consent form, testified that she would not go into the garage without defendant's permission. The trial court implicitly found that defendant's father, when faced with an extended period of time when defendant was away, might go into the garage without defendant's permission. However, aspects of defendant's father's testimony that the trial court expressly found credible—that he would not enter the garage without permission if defendant was in the garage or if defendant would be away for two hours—indicate that, in practice, defendant's parents respected their agreement with defendant that he could "have" the garage.

In short, defendant's parents, as evidenced by their testimony that they had agreed with defendant that he could "have" the garage and by their own actions, had effectively ceded most of the control over the garage to defendant, so that defendant, under the circumstances—*i.e.*, he was present at the time the police arrived and sought consent to search—could expect that they lacked authority to allow the police to search the garage without his consent.[9] *Carsey*, 295 Or at 44-46 (consent search invalid where the defendant had not assumed the risk that his grandmother would consent to the search of his room). The state, accordingly, failed to meet its burden of proving that the warrantless search of the garage was authorized by defendant's parents' consent, because defendant's parents did not have actual authority to consent to the search. ORS 133.693(4).

Thus, because the trial court erred when it applied Measure 40 and denied defendant's motion to suppress pursuant to federal law, and because defendant's parents lacked

---

[9] That conclusion is particularly appropriate under the specific facts of this case, because defendant was present in the garage at the time of the initial search, and the trial court found that defendant's parents would never enter the garage without defendant's permission if defendant was present in the garage.

actual authority to consent under Oregon law, we reverse defendant's convictions and remand to the trial court.

Reversed and remanded.