Argued and submitted August 29, 2001, reversed and remanded August 14, 2002

# STATE OF OREGON,
*Appellant,*

*v.*

# SANDRA DEE SURFACE,
*Respondent.*

## CR9900534

# STATE OF OREGON,
*Appellant,*

*v.*

# KENNETH ALLEN HURLEY,
*Respondent.*

## CR9900534, CR9900535; A108152

51 P3d 713

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Beth A. Corbo, Deputy Public Defender, argued the cause for respondents. With her on the brief was David E. Groom, Public Defender.

Before Landau, Presiding Judge, and Brewer, Judge, and Collins, Judge pro tempore.

COLLINS, J. pro tempore

### COLLINS, J. pro tempore

The state appeals the trial court's pretrial order to suppress evidence of a methamphetamine lab found in a room that defendants had left locked when they turned their house over to house sitters. The evidence was seized pursuant to two search warrants. The affidavit for the first search warrant contained observations made by a deputy sheriff after one of the house sitters allowed her to enter the house. The trial court found that the document giving the house sitters authority over the premises was not intended to give them authority to consent to a search of the locked room. The state argues that the broadly worded document did allow the house sitters to give consent. We agree with the state.

■ "A trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings. Our function is to decide whether the trial court applied legal principles correctly to those facts." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993) (citations omitted). The following facts found by the trial court are supported by the record. Delbert and Rick Stevens were house sitting a rented cottage for defendants Surface and Hurley. A side room of the cottage was closed off by a bifold door that would stay closed only when fastened. Delbert Stevens had been in the room with defendant Hurley before defendants left but had not noticed that Hurley fasten the door with a padlock.

Defendants' landlord called the sheriff's office because she did not recognize the Stevenses. When Deputy Sheriff Jodi Westerman arrived, Rick Stevens approached her and the landlord and showed them a note from defendants giving the Stevenses authority to be in the house in their absence. Rick Stevens told Deputy Westerman, "they gave us full run of the place." The note read as follows:

"To whom it may concern:

"The residents of the house at 56242-A East Highway 26, have gone out of town and have left freinds [*sic*] in charge of our household. The freinds [*sic*] are Del Stevens and Rick Stevens. They will be staying at our house and

have complete control of my household and everything pertaining to it. * * *

"Thanks

"Sandra Surface and Ken Hurley"

Rick Stevens also told the deputy that he had smelled an unusual odor that he knew was associated with marijuana growing or methamphetamine production coming from a small room with a lock on the door. He indicated he had previous personal experience with methamphetamine and knew about its appearance and the odor and manufacturing process. He indicated that he had used bolt cutters to break the lock and had entered the room. Once inside, Stevens noticed an odor that he knew to be associated with the manufacture of methamphetamine and saw glassware and a black duffel bag containing several chemicals that he knew to be associated with the manufacture of methamphetamine. Stevens also reported finding a cake pan with methamphetamine residue in a dresser drawer in another room and a jar with methamphetamine oil in the freezer compartment of the kitchen refrigerator. Stevens then showed Westerman the room. Westerman, too, saw what she recognized as methamphetamine lab equipment and noticed a "cat urine" odor that is associated with the manufacture of methamphetamine. She also saw the cake pan with the white powdery residue that Stevens had identified as methamphetamine.

A different deputy sought a search warrant. That deputy's affidavit in support of the warrant contained the above information from Deputy Westerman. The affiant also noted that his training and experience confirmed that the equipment, chemicals, odor, pan and residue, and methamphetamine oil are associated with methamphetamine production. The equipment from the small room and the cake pan from the dresser were seized pursuant to the warrant. For safety reasons, the jar with methamphetamine oil was left behind but was seized later pursuant to the second search warrant. The second warrant relied on the information from the affidavit in support of first search warrant.

Defendants were charged with, among other things, manufacture and delivery of a controlled substance. ORS

475.992(1)(b). Before trial, they filed a motion to suppress evidence seized at the house and a motion to controvert, arguing that the Stevenses did not have the authority to consent to a search. The trial court granted the motion to suppress, stating that the scope of authority granted by the note was limited by defendants' intent: "It's pretty obvious [defendants] didn't want—they weren't giving an open-ended authority to all the world to search their place, *that wasn't their intent.*" (Emphasis added.) The trial court suppressed evidence from the locked room, the freezer, and the dresser.[1] The state appeals only as to the evidence found in the locked room and the freezer.

■ The state argues that the house was lawfully searched and the evidence should not be suppressed. Because of the note, the state argues that Rick and Delbert Stevens had actual authority over the "household and everything pertaining to it" and could legally consent to a police search of every room in the house and the freezer. Defendants respond that the Stevenses did not have "joint access" to the lab room because it was locked and, therefore, they did not have authority to consent to the search of it. They further argue that the Stevenses did not have joint use of the freezer and could not consent to its search either. We agree with the state.

■ We analyze defendants' right to be free from unreasonable searches under Article I, section 9, of the Oregon Constitution. A warrantless search may be conducted if the owner of the premises consents to the search. *State v. Paulson,* 313 Or 346, 351-52, 833 P2d 1278 (1992). A third party may consent to the search if the third party has actual, not apparent, authority. *State v. Ready,* 148 Or App 149, 154-55, 939 P2d 117, *rev den* 326 Or 68 (1997). The state bears the burden of proving that the third party has actual authority. *State v. Fuller,* 158 Or App 501, 505, 976 P2d 1137 (1999). Whether the third party had actual authority involves a resolution of factual issues, *State v. Wrenn,* 150 Or App 96, 103,

---

[1] The record does not explain why a finding of lack of authority to consent to a search of the locked room would also result in suppression of the cake pan found in the dresser and the methamphetamine oil found in the freezer. The record also does not address the sufficiency of the warrant without Westerman's observations that were made inside the residence.

945 P2d 608 (1997), but the "question of whether a person has actual authority at the time consent is given is ultimately a question of law," *State v. Beylund*, 158 Or App 410, 416-17, 976 P2d 1141, *rev den* 328 Or 594 (1999).

■  The principles of third-party consent were set out in *State v. Carsey*, 295 Or 32, 38-46, 664 P2d 1085 (1983). Third-party consent had been held valid, however, before *Carsey*. *State v. Cook*, 242 Or 509, 515, 411 P2d 78 (1966); *State v. Williams*, 48 Or App 293, 297, 616 P2d 1178 (1980) ("It is well established that a consent to search is valid if made by one who has 'common authority over, general access to, or mutual use of the place or object sought to be inspected[.]' ") (citation omitted). In *Carsey*, the Oregon Supreme Court held:

> "Before police can search premises in reliance upon the consent of a third person, they should ascertain that the defendant and the consenting party have a common use, access, or control of the premises to be searched."

295 Or at 46. The inquiry focuses on whether the third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *State v. Lynch*, 94 Or App 168, 172, 764 P2d 957 (1988). "Sufficient 'common authority' exists if the third party has the right to permit the inspection and if the affected party 'has concurrently either assumed the risk that the other may consent to a search or given up his reasonable expectation of privacy.' " *State v. Rohrbach*, 93 Or App 608, 611, 763 P2d 196 (1988) (citation omitted). That the owner of the premises "has effectively assumed the risk that the third party might consent to a search" is a recognized factor in determining whether the third party has actual authority to consent to a search. *State v. Jenkins*, 179 Or App 92, 101, 39 P3d 868 (2002); *see also Fuller*, 158 Or App at 506; *Beylund*, 158 Or App at 418.

Most of the cases concerning third-party consent have involved roommates or families sharing a household and have focused on "commonality of use." *Carsey*, 295 Or at 44. The few cases in which the third party completely occupies the premises, and the owner does not, focus on the totality of control of the third person. *Cook*, 242 Or at 515; *Beylund*, 158 Or App at 418 ("Although defendant correctly

points out that access to or use of one area of property does not necessarily imply authority to consent to a search of all portions of the premises, [the third party] testified that he had full access to the shop basement."). The situation here is similar to the second type of case; the Stevenses had a note that provided them with "complete control of [the] household and everything pertaining to it." That note gave them the kind of totality of control that was sufficient to find authority over every room in the house as in *Beylund* and *Cook*. Therefore, we find that defendants granted common authority over the house to the Stevenses and consequently assumed the risk that the Stevenses would consent to a search.[2] The initial search of the locked room was valid based on the Stevenses' lawful consent. It follows that evidence seized as a result of that search need not be suppressed.

■■  Actual authority over rooms in a house, however, may not necessarily extend to personal property in the house: "authority to consent to a search of an area is not necessarily coextensive with authority to consent to a search of personal items within that area." *Fuller*, 158 Or App at 506. Consequently, we separately analyze whether the Stevenses had authority over the freezer. In that light, we consider the extent of the Stevenses' use of, access to, and control of the freezer. *See Fuller*, 158 Or App at 506; *see also Lynch*, 94 Or App at 172 ("The owner of a vehicle, for example, may consent to a search of that vehicle by police, but may not consent to a search of a passenger's effects unless those effects are in common use by the occupants of the vehicle or are jointly controlled by the passenger and the owner of the vehicle.").

Here, the note gave the Stevenses control of the "household and everything pertaining to it." In addition, defendants invited the Stevenses to sleep in the house and eat the food in the house, including food in the refrigerator, and the freezer that was a part of the refrigerator. From this evidence, we find that the Stevenses had actual authority

---

[2] Delbert Stevens had been in the room with defendant Hurley before the defendants left. Delbert Stevens testified there was no drug paraphernalia in the room at that time. He testified that he did not notice Hurley locking the room after he and Hurley left. As noted above, the door would apparently not stay shut without being fastened.

over the freezer, as well, and could lawfully consent to a search of it.

Because the locked room and freezer were lawfully searched with the Stevenses' consent, the information derived from those searches was properly used in the affidavit supporting the subsequent search warrant. *Compare State v. Coleman*, 167 Or App 86, 90, 2 P3d 399 (2000) (where evidence in affidavit was secured in violation of Article I, section 9, of the Oregon Constitution, the evidence was struck from the affidavit and the search warrant was not supported by probable cause). Therefore, the search warrants were valid and the evidence seized under the search warrants is admissible.[3]

Reversed and remanded.

---

[3] We note that, where the trial court determined that the consent to search was not valid and that evidence obtained from that search therefore could not properly be included in the affidavit in support of a search warrant, the proper next step would have been for the trial court to consider whether, after the evidence resulting from the consent search was excised, the affidavit nevertheless demonstrated probable cause to search. The burden of proof is on the defendant to show the invalidity of the warrant in that regard. *State v. Hall*, 166 Or App 348, 356, 999 P2d 509 (2000).