Submitted May 19, 2015, reversed and remanded for entry of judgment allowing demurrer July 19, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DONTAE LAMAR MARKS,
*Defendant-Appellant.*

Multnomah County Circuit Court
120733023; A155465

400 P3d 951

Peter Gartlan, Chief Defender, and Ingrid A. MacFarlane, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Michael S. Shin, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and DeHoog, Judge, and Edmonds, Senior Judge.

**TOOKEY, P. J.**

Defendant appeals from an amended judgment of conviction entered after a trial court found defendant guilty of one count of compelling prostitution, ORS 167.017(1), one count of felon in possession of a firearm, ORS 166.270(1), and two counts of unlawful use of a weapon with a firearm, ORS 166.220(1). He assigns error to the trial court's disallowance of his demurrer to the indictment, arguing that the indictment was legally defective because it did not allege a basis for joining multiple counts in a single indictment as required by ORS 132.560. We conclude that the trial court erred in disallowing defendant's demurrer, and we also conclude that the error was not harmless. Consequently, we reverse and remand for entry of judgment allowing demurrer.

The crimes on which defendant was indicted involved the same victim, C. Defendant was convicted after a bench trial on stipulated facts, which consisted primarily of police reports, some photographs related to the prostitution charge against defendant, and copies of text messages that defendant had sent to C. The following facts are taken from the police reports.

For approximately seven and one-half months, from mid-June 2011 through late January 2012, defendant and C had a sexually intimate relationship in which defendant gradually exerted more and more emotional and physical control over C. They first met each other via an online dating service, and upon meeting each other face-to-face, their relationship progressed rapidly. Shortly after they began dating, defendant began pressuring C to try stripping or advertising herself online as an escort, explaining that he could not work because of a brain injury and that he needed money. Although C offered to get a second job to help defendant, defendant said that C would not make money fast enough at a second job. He told C that she should trust him and that if she disagreed with him about stripping or working as an escort, their relationship "would not work out."

C resisted defendant's efforts to get her to work as an escort until late September, when defendant informed C that his sister, with whom defendant resided, had received a 72-hour eviction notice. Explaining that he, his sister, and

her children would be evicted, he asked C to help pay his sister's rent by being an escort. C agreed. Defendant, using his sister's laptop and C's bankcard, posted an advertisement for C's escort services on an online site called "Backpage." That weekend, C had three "service calls," each of which involved the exchange of money for sexual intercourse. Defendant transported C to the appointments, and C gave defendant the money that she had received at each of the appointments. After the last appointment, defendant told C that she would never have to act as an escort again.

Defendant's promise, however, was soon broken. Defendant convinced C to move out of her parent's home and lease her own apartment. By mid-October, defendant had moved in with C, and defendant again began to talk about the need for more money, explaining that C's regular job did not provide sufficient funds to live comfortably and in a way that suited him, so she should again advertise herself online as an escort.

Although C at first refused to work again as an escort, she finally relented, and from November until late January, C spent most weekends earning extra money "doing jobs." C would receive requests for services on her cell phone and defendant would listen to the conversation via speakerphone and tell C how to respond. Defendant would drive with C to the appointments and sometimes take her cell phone to monitor the requests for, and responses about, her services as an escort. Defendant also took control over C's finances. Defendant had no bank account of his own, but kept C's bankcard and had access to all of her money.

C later explained to police officers that she did not want to work as an escort and engage in prostitution, but she had a hard time refusing defendant's demand that she continue to do so. C said she tried to explain to defendant her humiliation and insecurity in participating in the escort dates, but defendant would get upset and argue with her and sometimes physically assault her. In November, while driving with defendant, C told defendant that she did not want to continue engaging in prostitution because she felt "taken advantage of and used," and defendant hit her on the face with his open hand. However, defendant's assaults were not

limited to instances when C would express concerns about engaging in prostitution. He would regularly pull her hair to drag her closer to him or pin her arms down on the bed with enough strength that it would leave bruises on her arms.

Defendant became the most volatile when C would confront him about his contact with other women. One day in December, C confronted defendant about the women that she had discovered he was contacting online. C said there was "pushing and shoving" after she confronted him, and then defendant pulled out a gun and, holding it at his side, told C that he wanted her to "cooperate in communicating with him."

On January 20, 2012, defendant found C searching their computer for signs of his online contacts with other women. He began punching C on the arms, and when C told defendant that she was going to leave because "I know what I'm worth," defendant hit her on the head, pushed her onto the bed, and began choking her. Defendant calmed down enough to briefly let C go, but returned with his gun. Pointing the gun at C, defendant told her to explain how she had been "digging around" on the internet. C explained how she had searched for the information on the computer. As C did so, defendant placed the gun against her head. Terrified, C urinated on herself; she heard him "rack the gun" and believed it was loaded. Defendant then handed the gun to C and told her to point it at him. Defendant told C that, if she did not point the gun at him, he would "put his hands on her." C took the gun, but did not point it at him. Defendant continued to goad her, stating, "If I'm such a horrible person, why not shoot me?" Eventually, defendant calmed down, let C go, and told C that "she needs to do what he tells her to do." Later that night, C went out and did an escorting job. After C had returned from the escort appointment, she went to the bathroom to brush her teeth because she had performed oral sex on the client, and she started crying. Defendant heard C crying and told C to "get over it." When C did not stop crying, defendant kicked her into the bathtub, telling her to "hurry up and take a bath."

On January 25, 2012, defendant again became angry when he learned that C had contacted one of the women

whom defendant had been contacting online. He retrieved his gun and pointed it at C. Defendant stated, "If you don't tell me the truth, I'll pop you one in the head!" Defendant hit C, threw her to the ground, kicked her, and pointed the gun at her again, telling her that if she was lying to him, he really would shoot her. C believed that defendant would kill her, and in her terror, she urinated on herself again. Defendant, seeing that C had wet herself, told her to take her "filthy clothes off." As C was cleaning up the urine, defendant calmed down, placed the gun on a chest at the end of the bed, and began looking at C's phone for any new "dates."

C then went to the kitchen on the pretense of finding some cleaning supplies and, as defendant was distracted by texting or doing something on her phone, C fled the apartment. Shoeless and coatless, C ran out to the street and saw that defendant had come outside to look for her. Eventually, C was able to flag down a motorist who took C to a safe location. C contacted the police and defendant was arrested the next day.

The state brought one indictment against defendant, alleging 17 counts of various crimes, including, *inter alia*, compelling prostitution, promoting prostitution, felon in possession of a firearm, coercion, menacing, unlawful use of a weapon with a firearm, and assault in the fourth degree. Defendant then filed a demurrer to the indictment, arguing that the state had failed to allege the bases for joining multiple counts in one indictment, as required by ORS 132.560. After a hearing on the motion, the trial court disallowed the demurrer.

The state and defendant then agreed that the state would dismiss all but four of the counts against defendant and that defendant would be tried by the court on the remaining counts, stipulating to the police reports and other police records as the facts on which defendant would be tried. The court found defendant guilty of the four remaining counts: compelling prostitution (Count 1), ORS 167.017(1);[1] felon

---

[1] A person commits the crime of compelling prostitution "if the person knowingly * * * uses force or intimidation to compel another to engage in prostitution." ORS 167.017(1) (2011). ORS 167.017(1) was amended by Oregon Laws 2013, chapter 271, section 1; this amendment does not affect the analysis in this case.

in possession of a firearm (Count 2), ORS 166.270(1);[2] and unlawful use of a weapon (Counts 7 and 13), ORS 166.220.[3] Defendant appeals from the amended judgment of conviction and assigns error to the court's denial of his demurrer.

We review the denial of a demurrer for errors of law. *State v. Woodall*, 259 Or App 67, 69, 313 P3d 298 (2013), *rev den*, 354 Or 735 (2014) (citing *State v. Cervantes*, 232 Or App 567, 580, 223 P3d 425 (2009)). The issue we are asked to determine is whether the indictment was legally insufficient under the provisions of ORS 132.560. ORS 132.560 provides, in pertinent part:

"(1) A charging instrument must charge but one offense, and in one form only, except that:

"* * * * *

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A) Of the same or similar character;

"(B) Based on the same act or transaction; or

"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Defendant argues on appeal, and argued to the trial court below, that the statute required the state to allege facts showing that the multiple charges were properly joined. In particular, defendant argues that the indictment should

---

[2] ORS 166.270(1) provides:

"Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

[3] ORS 166.220 provides, in pertinent part:

"(1) A person commits the crime of unlawful use of a weapon if the person:

"(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon[.]"

have included joinder language directly from ORS 132.560. The state concedes that it did not allege language from the joinder statute, but contends that the facts, as alleged in the indictment, showed that the crimes were, pursuant to ORS 132.560(1)(b)(C), "connected together or constitut[ed] parts of a common scheme or plan."[4]

Since defendant's appeal was filed, we held in *State v. Poston*, 277 Or App 137, 144-45, 370 P3d 904 (2016), *adh'd to on recons*, 285 Or App 750, 399 P3d 488 (2017), that, in order to meet the requirements of ORS 132.560, "the state [is] required to allege in the charging instrument the basis for the joinder of the crimes that are charged in it, whether by alleging the basis for the joinder in the language of the joinder statute or by alleging facts sufficient to establish compliance with the joinder statute."

Because the state has already acknowledged that the indictment does not include language from the joinder statute, the only issue before us is whether the state has, as it contends, alleged facts sufficient to show that the crimes, pursuant to ORS 132.560(1)(b)(C), "[were] connected together or constitut[ed] parts of a common scheme or plan." To determine whether the state's indictment met those requirements, we consider the state's allegations for each count.

For compelling prostitution (Count 1), the state alleged the following:

"[Defendant] on or between August 01, 2011 and January 25, 2012, * * * did unlawfully and knowingly use force and intimidation to compel [C] to engage in prostitution[.]"

For felon in possession of a firearm (Count 2), the state alleged the following:

"[Defendant] on or between June 01, 2011 and January 25, 2012, * * * having previously been convicted * * * of the felony of Assault in the Third Degree * * * [and] of the felony of

---

[4] At the hearing, the trial court questioned the state as to why it had not simply included the joinder language from ORS 132.560 in the indictment, and said that the state "should be more explicit about these matters." Nevertheless, the trial court subsequently concluded—without explanation—that the indictment's allegations were sufficient to withstand the demurrer.

Coercion, did unlawfully and knowingly own, have in said defendant's possession, have under said defendant's custody and have under said defendant's control a firearm[.]"

For unlawful use of a weapon with a firearm (Counts 7 and 13), the state alleged that on January 20, 2012, and January 25, 2012, respectively, defendant used a firearm "with intent to use unlawfully against [C], * * * [and] intentionally, knowingly, or recklessly placed [C] in fear of imminent serious physical injury."

As we understand the parties' arguments, the issue here is not whether the state alleged an adequate basis for the charges relating to firearms to be joined in the same indictment, but whether the state alleged an adequate basis for joining the compelling prostitution charge to the firearm charges. According to the state, "the nature and timing of the offenses made clear that they were connected together or part of a common scheme or plan."

We disagree. Even if the state chooses not to use the exact joinder language of ORS 132.560(1)(b)(C), the state must nevertheless use some language specifically connecting the crimes together, or specifying the crimes' common scheme or plan. In this case, there are no words in the indictment connecting the compelling prostitution charge to the firearm charges, nor are there words specifying the common scheme or plan between the compelling prostitution charge and the firearm charges. Therefore, we conclude that the indictment did not allege facts sufficient to establish compliance with the joinder statute, and, consequently, the state did not meet the requirements of ORS 132.560. Accordingly, the trial court erred in disallowing defendant's demurrer.

Nevertheless, our conclusion that the trial court erred in disallowing defendant's demurrer does not necessarily require that we reverse the convictions arising from the indictment. "Under Article VII (Amended), section 3, of the Oregon Constitution,[5] we must affirm a conviction

---

[5] Article VII (Amended), section 3, provides, in pertinent part:

"If the Supreme Court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

if there is little likelihood that an error affected the verdict." *Poston*, 277 Or App at 145 (citation, internal quotation marks, and brackets omitted); *see also State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?"). We therefore turn to the separate question of whether the indictment's improper joinder of charges "affected the verdict." *Poston*, 277 Or App at 145. "[W]hether improper joinder of the charges affected the verdict depends on whether joinder led to the admission of evidence that would not have been admissible but for the joinder of the [firearm charges and compelling prostitution] charge[], and, if so, whether that evidence affected the verdict on those charges." *Id.* That analysis requires us to examine the erroneously joined charges as if they had been tried separately and determine whether "all of the evidence that was presented at defendant's trial would have been admissible." *Id.* at 146.

> "Our analysis in *Poston* demonstrates that evidence presented at trial on erroneously joined charges would be 'admissible,' as we used that term in *Poston*, in a hypothetical trial on each charge or properly joined group of charges, only when (1) each item of evidence that was actually presented could have been admitted in the hypothetical trial under a legally correct evidentiary analysis and (2) it is implausible that, had the defendant objected under OEC 403 or raised some other objection invoking the trial court's discretion, the trial court would have excluded that evidence in the hypothetical trial."

*State v. Clardy*, 286 Or App 745, 772-73, 401 P3d 1188 (2017).

In this case, we now consider whether all of the evidence that was presented at defendant's trial would have been "admissible" at a trial in which defendant was charged only with compelling prostitution. Without speculating, we cannot determine that the evidence of defendant's prior felony conviction, admitted here to prove the felon in possession of a firearm charge, would be admissible under a legally correct evidentiary analysis at a trial in which defendant was charged only with compelling prostitution. Likewise, we cannot conclude that all of the evidence related

to prostitution activities would have been "admissible" at a trial in which defendant was charged only with the firearm crimes. Even if some of that evidence might be able to be admitted under a legally correct evidentiary analysis, it is not implausible that a trial court would have excluded some of the evidence related to prostitution activities.

Next, we turn to the question of "whether that evidence affected the verdict on those charges" in a bench trial. *Poston*, 277 Or App at 145. On a trial to the court without a jury, the trial court's "judgment is the same as a jury verdict." *State v. Lloyd A. Fry Roofing Co.*, 9 Or App 189, 205, 495 P2d 751, *adh'd to on rem'd*, 11 Or App 403 (1972) (citing *City of Oakland v. Moore*, 1 Or App 80, 83, 457 P2d 659 (1969)). The error could be harmless if the trial court did not consider the evidence related to the other charges when it found the defendant guilty. *See State v. Klontz*, 257 Or App 684, 702-03, 308 P3d 214 (2013) (concluding that the harmless error analysis in a bench trial where the trial court failed to mention contested evidence when explaining its disposition is "contextually driven" and that we must ask "[w]as the disputed evidence ultimately material to the resolution of issues disputed at trial?").

After the parties stipulated to the facts, the trial court ruled:

"All right. And to take a step beyond that, I gather the parties have also stipulated to what I'm going to find when I go through those facts. And my understanding of that is *** that I'm going to reach the conclusion that [defendant] is guilty of Counts 1 and 2, and Count 7 and Count 13.

"And so that's Compelling Prostitution, is Count 1.

"Felon in Possession of a Firearm is Count 2.

"Count 7 is Unlawful Use of a Weapon, a Firearm, Domestic Violence. That's Count 7.

"And Count 13 is Unlawful Use of a Weapon, a Firearm, also Domestic Violence, but on a different day than Count 7.

"So those four charges, if the parties agreed my review of the record would lead me to convict [defendant] of, and I'm going to thank you for your work in sorting that out, and find [defendant] guilty on those four counts."

Because it is not clear that the trial court conducted a separate analysis of the evidence, the trial court's error in disallowing defendant's demurrer based on the improper joinder of charges was not harmless. Accordingly, we must reverse the firearm convictions and the compelling prostitution conviction.

Reversed and remanded for entry of judgment allowing demurrer.

**EDMONDS, S. J.,** concurring.

I write separately in this case to express my view that, under Article VII (Amended), section 3, of the Oregon Constitution, the majority's harmless error analysis is improper. In this case, we hold that the trial court erred in denying defendant's demurrer. I agree with that holding and it is dispositive; the majority's harmless error analysis thereafter is unnecessary and is contrary to Article VII (Amended), section 3, for two reasons, developed more fully below. It follows, in my view, that remand for the trial to allow the demurrer is the proper disposition in this case, but without the majority's discussion of harmless error.

The issue, as restated from above, is whether an appellate court should conduct a harmless error analysis under Article VII (Amended), section 3, after it concludes that a demurrer was erroneously disallowed. Relying on *State v. Poston*, 277 Or App 137, 145, 370 P3d 904 (2016), the majority holds that a harmless error analysis is required under Article VII (Amended), section 3. However, *Poston* is clearly wrong in that regard, and the majority errs in following its precedent.

Article VII (Amended), section 3, provides, in pertinent part:

"[i]f the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, *notwithstanding any error committed during the trial*[.]"

(Emphasis added.)

Thus, for Article VII (Amended), section 3, to apply, the trial court's error must have been "committed during the trial." That requirement leads to two observations with respect to this case: First, the error committed by the trial court in this case when it disallowed defendant's demurrer was made as a pretrial ruling; it was not an error committed during trial. Second, even if the erroneous ruling could be considered to have been made during trial for purposes of Article VII (Amended), section 3, the harmless error analysis the majority employs is improper in this case. In the absence of the trial court's error, the indictment would have been dismissed and, under those circumstances, there would have been no "trial" at all.

A general understanding of the nature of a demurrer supports the foregoing observations. In general, a demurrer assumes that the facts alleged in the accusatory instrument are true and asserts that the legal consequences of the facts plead are that no plea and trial in response to the allegations need occur as a matter of law. Thus, because a successful demurrer would resolve the charges in the accusatory instrument in defendant's favor as a matter of law, the allowance of a demurrer would be a dispositive ruling that ended the case for all purposes. A trial, in contrast, commences when a jury is empanelled, or when a defendant waives jury and the case proceeds to an adjudication of the charges alleged in the accusatory instrument. In this case, the denial of defendant's demurrer occurred pretrial and not during trial. On those facts, in my view, a harmless error analysis under Article VII (Amended), section 3, is improper because the trial court's error in disallowing the demurrer was not an "error committed during the trial." Furthermore, even if Article VII (Amended), section 3, harmless error analysis could apply, the error in this case could not be harmless. In the absence of the trial court's error, there would have been no trial because the allowance of the demurrer would have constituted a final disposition of the case.

The Oregon Criminal Procedural Code (ORS 135.610 to 135.700, in particular) contemplates that a ruling allowing a demurrer constitutes a final disposition subject

to exceptions which are inapplicable here. A "demurrer" generally is an instrument filed "at the time of arraignment or at such other time as may be allowed" by the court. ORS 135.610(1). ORS 135.630 provides that a defendant "may demur to the accusatory instrument when it appears upon the face thereof" and then enumerates the grounds on which a demurrer may be based, including ORS 135.630(2).[1] That provision incorporates by reference the joinder requirements of ORS 132.560(1)(b)(C). ORS 135.640 provides that, when the objections mentioned in ORS 136.630 appear on the face of the accusatory instrument, they must be raised by demurrer, except if the ground for objection is the lack of subject matter jurisdiction or that the facts stated do not constitute an offense, in which cases an objection may be taken at trial under a plea of not guilty and in arrest of judgment. In light of those requirements, it follows that any pleading deficiency regarding the joinder requirements of ORS 132.560 must be raised by a pretrial demurrer; any objection not so raised is deemed waived under ORS 135.640.

"Upon considering the demurrer, the court shall give judgment, either allowing or disallowing it, and an entry to that effect shall be made in the register." ORS 135.660. "If the demurrer is allowed, the judgment is *final* upon the accusatory instrument demurred to and is a bar to another action for the same crime" subject to the court allowing the case to be resubmitted to the grand jury or

---

[1] ORS 135.630 provides:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"(1) If the accusatory instrument is an indictment, that the grand jury by which it was found had no legal authority to inquire into the crime charged because the same is not triable within the county;

"(2) If the accusatory instrument is an indictment, that it does not substantially conform to the requirements of ORS 132.510 to 132.560, 135.713, 135.715, 135.717 to 135.737, 135.740 and 135.743;

"(3) That the accusatory instrument charges more than one offense not separately stated;

"(4) That the facts stated do not constitute an offense;

"(5) That the accusatory instrument contains matter which, if true, would constitute legal justification or excuse of the offense charged or other legal bar to the action; or

"(6) That the accusatory instrument is not definite and certain."

refiled by the state. ORS 135.670(1) (emphasis added). If, on the other hand, the demurrer is disallowed, ORS 135.700 provides that the court shall permit the defendant to enter a plea and proceed to trial. Under those statutes, had the trial court allowed the demurrer as it should have, it was required to enter a final judgment in favor of defendant on the charges in the accusatory instrument.

Applying an Article VII (Amended), section 3, harmless error analysis to what is intended, under the governing statutes, to constitute a final adjudication of the allegations in the accusatory instrument is inconsistent with the terms of that constitutional provision. Again, under the terms of that provision, for harmless error analysis to apply, the error must have been committed during the trial and, in the circumstances here, that is not the case.[2]

And, again, even assuming that Article VII (Amended), section 3, harmless error analysis could apply, the error in this case could not be harmless because the allowance of demurrer would have constituted a final disposition of the case. Furthermore, by applying the analysis set forth in *Poston,* the majority improperly provides the state a "second bite of the proverbial apple" on appeal to affirm a conviction based on an accusatory instrument that was of no legal effect *ab initio.* Said otherwise, Article VII (Amended), section 3, could not have been intended by the voters, who adopted it in 1910, to have the legal effect of transforming a void accusatory instrument into the foundation for a legally valid judgment of conviction.

In sum, the error in this case was not committed during trial, and, even if Article VII (Amended), section 3, is somehow applicable, "[t]he context of the legal error * * * is significant" in determining whether error is harmless. *State v. Davis,* 336 Or 19, 33, 77 P3d 1111 (2003). The harmless error analysis employed by the majority—considering

---

[2] Some pretrial rulings (*e.g.,* the failure to suppress evidence) could result in evidentiary errors committed during trial for purposes of Article VII (Amended), section 3. However, because the failure to allege ultimate facts regarding joinder is a final disposition in this case and that ground can only be raised pretrial by demurrer under the governing statutes, there is no need to further explore the scope of what constitutes "error committed during the trial."

evidence that was admitted in a trial that should never have occurred—is improper. A correct ruling on defendant's demurrer in this case would have resulted in a final judgment resolving the accusatory instrument in defendant's favor. Thus, because no verdict in this case should have been rendered at all, the only logical conclusion is that the error in disallowing the demurrer affected the verdict. *See id.* (the "ultimate issue under Article VII (Amended), section 3, * * * [is] whether there was little likelihood that the error affected the verdict").

Finally, I observe that, in *Poston*, the court cited *State v. Eberhardt*, 225 Or App 275, 201 P3d 915 (2009), *rev den*, 347 Or 608 (2010), as support for its application of its harmless error analysis. *See Poston*, 277 Or App at 145. But, as the *Poston* court acknowledged, *Eberhardt*'s factual posture differs from *Poston* and this case. In *Eberhardt*, the defendant claimed that the indictment did not state facts sufficient to constitute a crime. 225 Or App at 277. In response to that argument, we concluded that, even if the demurrer should have been allowed, any error would be harmless. However, we did not engage in that case with the question of whether a harmless error analysis under Article VII (Amended), section 3, was proper in the first instance. Rather, we merely assumed without deciding that such an analysis would apply. Thus, in my view, *Eberhardt* does not support the *Poston* ruling.

For the foregoing reasons, the majority errs in this case when it follows the *Poston* analysis. Although the majority's analysis regarding harmless error is incorrect, that error does not affect the outcome on appeal in this case.[3] The majority properly concludes that the trial court must allow the demurrer. Accordingly, I concur that the case ought to be remanded to the trial court to allow the demurrer.

---

[3] In *Poston*, the improper application of a harmless error analysis did affect the result. In that case, we held that all of the evidence presented at the defendant's trial was admissible to prove the defendant's culpable mental state in the promotion of prostitution but not with regard to the identity theft counts for which the defendant was charged. It followed necessarily that the erroneous denial of the demurrer was harmless as to the promoting prostitution counts but not harmless with respect to the identity theft counts. Without the application of a harmless error analysis, all of the defendant's convictions should have been reversed.