Argued and submitted January 3, 2019; convictions on Counts 15 and 18 reversed, remanded for resentencing, otherwise affirmed May 13, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LARRY ANDREW CARRILLO,
*Defendant-Appellant.*

Deschutes County Circuit Court
16CR21979, 16CR26838;
A165842 (Control), A165843

466 P3d 1023

Defendant was convicted of numerous offenses arising from six domestic-violence incidents. On appeal, he argues that the trial court erred in denying his motion to suppress evidence seized from his bedroom, because his intimate partner A lacked actual authority to consent to the search and seizures. Defendant also argues that the trial court erred in admitting evidence of his prior acts of domestic violence against a former intimate partner, B. Lastly, he argues that the trial court erred in denying his motion for judgments of acquittal on Counts 15 and 18, both of which charged unlawful use of a weapon, because there was no evidence that the discharges occurred within urban growth boundaries. *Held*: The trial court did not err in denying defendant's motion to suppress, because the evidence was sufficient to establish that A had actual authority to consent to the search and seizures. As for the evidence of prior domestic violence against B, any error in admitting that evidence was harmless. The trial court erred, however, in denying defendant's motion for judgments of acquittal on Counts 15 and 18, because, notwithstanding a deficiency in the indictment, the state had to prove that the discharge occurred within urban growth boundaries and failed to do so.

Convictions on Counts 15 and 18 reversed; remanded for resentencing; otherwise affirmed.

Stephen P. Forte, Judge.

Jason E. Thompson argued the cause for appellant. Also on the brief was Ferder Casebeer French & Thompson, LLP.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.*

AOYAGI, J.

Convictions on Counts 15 and 18 reversed; remanded for resentencing; otherwise affirmed.

_____

* Egan, C. J., *vice* Hadlock, J. pro tempore.

**AOYAGI, J.**

Defendant was convicted of five counts of unlawful use of a weapon (UUW), ORS 166.220; six counts of menacing, ORS 163.190; two counts of fourth-degree assault, ORS 163.160; two counts of coercion, ORS 163.275; and one count of strangulation, ORS 163.187. The victim of 14 of those crimes was defendant's intimate partner, A, and the victim of the other two crimes was defendant's adult son, M. On appeal, defendant raises seven assignments of error. We write only to address the second, third, and fourth assignments. We reject the first and sixth assignments without written discussion, and we do not reach the fifth and seventh assignments.

In the second assignment, defendant challenges the denial of his motion to suppress evidence seized from his bedroom. In the third assignment, defendant challenges the admission of evidence of previous acts of domestic violence against a former intimate partner, B. In the fourth assignment, defendant challenges the denial of his motion for judgment of acquittal on two UUW charges, Counts 15 and 18. For the reasons that follow, we reject the second and third assignments but agree that the court erred with respect to the fourth assignment.[1] Accordingly, we reverse defendant's convictions on Counts 15 and 18, remand for resentencing, and otherwise affirm.

## BASIC FACTS

Different facts are relevant to each assignment of error, and different standards of review apply to each assignment of error. We therefore state only the basic facts here and provide additional facts in discussing each assignment of error.

Defendant and A married in 2003 and divorced in 2009. After the divorce, A moved into her own apartment

---

[1] Because of our disposition of the fourth assignment, we do not reach the fifth assignment, which involves the same two UUW convictions, or the seventh assignment, which pertains to sentencing. *See former* ORS 138.222(5)(b) (2015), *repealed by* Or Laws 2017, ch 529, § 26 ("If the appellate court, in a case involving multiple counts of which at least one is a felony, reverses the judgment of conviction on any count and affirms other counts, the appellate court shall remand the case to the trial court for resentencing on the affirmed count or counts.").

briefly, but she moved back in with defendant in 2010. Defendant, A, and their two children continued to live together until at least April 2016.

According to A, defendant physically and verbally abused her throughout their relationship, and the physical violence escalated starting around 2014. According to defendant, A is fabricating the abuse, and he never abused her. The charges in this case relate to six specific incidents of domestic violence between June 2014 and April 2016, which are described here consistently with the trial court's ultimate judgment:

- In the first incident, A left the house after an argument with defendant. Defendant called A repeatedly, demanding that she return home. When A returned, defendant grabbed her by the hair and dragged her into the house while yelling at her.

- In the second incident, defendant came into the bedroom while A was sleeping and woke her by yelling and screaming. He pointed a handgun at her and fired two rounds into the bed as she lay on it.

- In the third incident, defendant "waterboarded" A by zip-tying her hands, pinning her to the bathtub, putting a cloth over her mouth, and pouring water over her face. He was trying to get A to "tell the truth" about relationships with other men.

- In the fourth incident, defendant pointed a firearm at M.

- In the fifth incident, defendant grabbed A by the neck, held a kitchen knife to her throat, and told her to be honest or he would kill her.

- In the sixth incident, defendant woke A by thumping her on the head, demanded that she tell the truth about an affair, put a gun to her head, and threatened to kill her.

A called the police in April 2016. According to A, she had intended never to report the abuse, but she realized after the last incident that defendant was actually going

to kill her, whether she reported it or not, so she might as well report it. During the ensuing investigation, the police searched defendant and A's bedroom, with A's consent, and, as discussed more later, seized evidence related to the second incident listed above.

Defendant was indicted on 26 counts of UUW, menacing, assault, coercion, strangulation, and attempted strangulation, as to A. He was separately charged with one count each of UUW and menacing as to M. The two cases were consolidated for trial. Before trial, defendant moved to suppress the evidence seized from his bedroom, arguing that A lacked authority to consent to the search. The trial court denied that motion. Also before trial, the state moved to admit evidence of defendant's uncharged acts of domestic violence against A and three other women. The court admitted some of that evidence under OEC 404(3), as relevant to hostile motive. Only the evidence related to one woman—defendant's former intimate partner B—is at issue on appeal. The state did not offer any evidence at trial about the other two women, and, on appeal, defendant does not challenge the admission of evidence of prior bad acts against A.

Defendant waived his right to a jury and was tried to the court. The trial lasted seven days. At the close of the state's case, defendant moved for judgment of acquittal on two of the UUW counts, Counts 15 and 18, which was denied. Ultimately, the trial court found defendant guilty on 16 charges, resulting in the previously described convictions. Defendant appeals.

## MOTION TO SUPPRESS

Before trial, defendant moved to suppress certain evidence seized from his bedroom, and he argues on appeal that the trial court erred in denying that motion. We review the denial of a motion to suppress for errors of law. *State v. Voyles*, 280 Or App 579, 581, 382 P3d 583, *rev den*, 360 Or 751 (2016). We are bound by the trial court's factual findings, so long as they are supported by constitutionally sufficient evidence, and, if findings were not made on all pertinent historical facts, we presume findings consistent with the trial court's ultimate conclusion. *Id.*

The facts relevant to the motion to suppress are as follows. In April 2016, the police investigated A's report of domestic violence. During the investigation, A told officers that defendant had once fired a gun into the bed while she was laying in it and that the bed and mattress were still at the house. The officers visited the house and requested A's consent to search the master bedroom. (Defendant was not present, because he had been arrested a few days earlier and was in jail.) At that time, A had been living with defendant in the house for six years, since she returned after their divorce. Although the title to the house was in defendant's name, A and defendant refinanced the mortgage together, A paid the mortgage payments, and A also paid rent to defendant. In addition to sharing the house generally, A specifically shared the bedroom with defendant, and the bed in that bedroom had been her exclusive sleeping location in the house for six years. A's clothes were in the bedroom closet, and her personal items were all over the bedroom.

A gave consent for the police to search the bedroom, including the bed. When the officers entered the bedroom, there were two visible bullet holes in the bed cover. The officers searched the bed and found additional bullet holes in the sheets, in a pillow, in the mattress, in the box spring, and in the carpet under the bed. The officers seized each of those items, including cutting out a small piece of carpet around the bullet hole in the carpet. The officers also seized some personal items lying under the bed—a receipt, photos, a poster, and a tote bag—that had visible bullet holes in them.

Before trial, defendant moved to suppress the evidence from the bedroom, arguing that A lacked authority to consent to the search and the seizures. The trial court denied the motion, concluding that A had legal authority to consent. On appeal, defendant claims that that was error, emphasizing that the title to the house was in his name and that the bed was awarded to him in the divorce.

Article I, section 9, of the Oregon Constitution protects people "against unreasonable search or seizure." Warrantless searches are *per se* unreasonable, unless the state establishes the applicability of an exception to the warrant

requirement. *State v. Bonilla*, 358 Or 475, 366 P3d 331 (2015). Consent is one such exception. To establish that exception, the state "must prove by a preponderance of the evidence that someone having the authority to do so voluntarily gave the police consent to search the defendant's property and that any limitations on the scope of the consent were complied with." *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994).

For purposes of Article I, section 9, a third party must have actual authority to consent to a search of someone else's property. *Nelson v. DMV*, 299 Or App 62, 447 P3d 1212 (2019). With respect to cohabitants, the court looks "at whether the effects are communally used by the parties *** or exclusively used by one party." *State v. Fuller*, 158 Or App 501, 506, 976 P2d 1137 (1999). To establish "common authority," the state must prove "mutual use of the property by persons generally having joint access or control for most purposes." *State v. Jenkins*, 179 Or App 92, 101, 39 P3d 868 (2002). As explained in *Jenkins*, the concept of common authority is distinct from legal ownership:

> "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Id.*

Common authority over a space does not necessarily equate to common authority over all items within the space. "[A]uthority to consent to a search of an area is not necessarily co-extensive with authority to consent to a search of personal items within that area." *Fuller*, 158 Or App at 506. The scope of a third party's authority over an area or an item is a fact-specific inquiry that depends on the "relationship of the third party to the premises or things searched." *Id.* at 505.

Here, the trial court did not err in denying defendant's motion to suppress. It is common authority, not legal ownership, that confers actual authority to consent to a search. *Jenkins*, 179 Or App at 100. In this case, the evidence was sufficient for the court to find that A shared common authority with defendant over the bedroom and the bed. Specifically, there was evidence that A had been living in the house for six years, had been sharing the bedroom and the bed with defendant for six years, kept her clothes in the bedroom closet, and had personal items all over the bedroom. There was no evidence that A's authority over the bedroom or the bed was limited. *See State v. Kurokawa-Lasciak*, 249 Or App 435, 441, 278 P3d 38 (2012) ("[W]here a defendant has expressly or by implication limited a co-occupant's authority, the resulting consent depends on whether the search is within that limited authority."). Nor did the officers search an item used exclusively by defendant. *See Fuller*, 158 Or App at 506 (reversing denial of motion to suppress, where, even if the defendant's girlfriend had common authority over their bedroom, she did not have authority to consent to a search of the defendant's nightstand, after having told the police that it was the defendant's, that it was locked, and that she did not have a key).

To the extent defendant argues that, even if A had authority to consent to the search of the bedroom and the bed, she lacked authority to consent to the seizures, we reject that argument. Defendant relies on *Voyles*, in which we recognized that searches and seizures "implicate different but related constitutional interests, namely, an individual's privacy and possessory interests in personal property," and "are separate acts calling for separate analysis." 280 Or App at 584 (internal quotation marks omitted). In *Voyles*, the defendant was boarding her horses at other people's properties. *Id*. at 582. The property owners consented to the police searching their properties and seizing the defendant's horses. *Id*. We held that the evidence was sufficient to establish that the third parties had actual authority to consent to the searches of their own properties but that it was insufficient to establish their authority to consent to the seizure of the defendant's horses, when the horses were merely boarded there. *Id*. at 589. "In other words, the third-party

property owners could not hand over horses that they did not have a legal right to hand over by virtue of the simple boarding relationship." *Id.*

In this case, unlike *Voyles*, A was a cohabitant with defendant who shared common authority over the bedroom and the bed. There was nothing akin to the mere boarding relationship in *Voyles*, and defendant has not presented a developed argument as to how A could have shared common authority over the bed and its components for search purposes but not for seizure purposes. Moreover, unlike the horses in *Voyles*, the mattress, box spring, bed cover, sheets, pillow, and carpet piece were recognizable evidence of a crime. *See id.* at 591 (discussing a case in which we held that an officer could seize a bag that the defendant had left in a friend's car, with the friend's consent, even if the friend lacked authority to consent to a search of the bag, where the officer recognized the bag itself as evidence of a crime). As for personal items under the bed, including the receipt put into evidence at trial, those items were in plain view once the other items were lawfully seized and were also recognizable evidence of a crime due to containing bullet holes. *See State v. Sargent*, 323 Or 455, 463, 918 P2d 819 (1996) ("One rationale for permitting seizure of evidence in plain view is that no unlawful search, and thus no illegality, was required to discover it."); *see also Voyles*, 280 Or App at 590 (citing *Sargent* for the proposition that law enforcement officers who make lawful entry into a private space may seize personal property within that space if they see evidence of a crime in plain view).

The trial court did not err in denying the motion to suppress.

## PRIOR BAD ACTS EVIDENCE

Defendant next argues that the trial court erred in admitting evidence of uncharged prior bad acts against his former intimate partner B. The trial court granted the state's pretrial motion to admit the evidence under OEC 404(3) as relevant to motive, specifically defendant's hostile motive toward A as a member of a class, to wit, intimate partners. Defendant argues that the court erred in admitting the evidence under OEC 404(3), because it was

not relevant to hostile motive and was merely propensity evidence. Under OEC 404(3), "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith," but it is admissible if it is relevant to noncharacter purposes, such as motive, subject to OEC 403 balancing. The state defends the trial court's ruling, arguing that the evidence was relevant to motive and that, in any event, any error was harmless.

Whether evidence of prior bad acts is relevant to motive is a question of law, *State v. Carreiro*, 185 Or App 19, 22, 57 P3d 910 (2002), that turns on "whether the state showed the existence of an adequate logical connection between the other acts and the charged acts," *State v. Tena*, 362 Or 514, 521, 412 P3d 175 (2018). In this case, we assume without deciding that the trial court erred in admitting B's testimony and proceed directly to the question of harmlessness, because it is dispositive.

As a matter of constitutional provision, statute, and rule, we may not reverse a judgment based on the erroneous admission of evidence if the error did not substantially affect defendant's rights, *i.e.*, was harmless. *See State v. Davis*, 336 Or 19, 27-28, 77 P3d 1111 (2003) (discussing Article VII (Amended), section 3, of the Oregon Constitution); *former* ORS 138.230 (2015) ("After hearing the appeal, the court shall give judgment, without regard * * * to technical errors, defects or exceptions which do not affect the substantial rights of the parties.");[2] OEC 103 ("Evidentiary error is not presumed to be prejudicial."). The standard reduces to "a single inquiry: Is there little likelihood that the particular error affected the verdict?" *Davis*, 336 Or at 32. To make that determination, "we examine the record as a whole and consider the error and the context in which it occurred." *State v. Durando*, 262 Or App 299, 305, 323 P3d 985, *adh'd to as modified on recons*, 264 Or App 289, 331 P3d 1095, *rev den*, 356 Or 400 (2014).

---

[2] *Former* ORS 138.230 (2015) was repealed by Oregon Laws 2017, chapter 529, section 26, for judgments entered on or after January 1, 2018. Or Laws 2017, ch 529, § 28. Because the judgment in this case was entered before that date, *former* ORS 138.230 (2015) is still applicable.

Here, five considerations lead us to conclude that there is little likelihood that any error in admitting B's testimony affected the trial court's judgment in this case. *See State v. Marks*, 286 Or App 775, 784, 400 P3d 951 (2017) ("On a trial to the court without a jury, the trial court's judgment is the same as a jury verdict." (Internal quotation marks omitted.)). First, this was a bench trial, the court essentially instructed itself not to consider the prior-acts evidence as character evidence, and nothing in the record indicates that the court nonetheless considered it as character evidence. Second, although B's testimony placed defendant in a very poor light, it paled in comparison to the evidence regarding A—including evidence of a long history of defendant physically, verbally, and emotionally abusing A and threatening to hurt her, kill her, take their children, and so on—making the evidence regarding B of a lesser quality than other, unchallenged evidence. Third, B's testimony was a relatively small part of a lengthy trial, and the state discussed but did not rely heavily on that evidence in its arguments to the court. Fourth, there was overwhelming evidence of the charged crimes, including numerous corroborating witnesses, medical evidence, and physical evidence, such that this was not a case in which the trial came down to a one-on-one credibility contest between defendant and A. Fifth, the ultimate judgment entered by the trial court is at least some indication that the court carefully considered the evidence as to each charged crime, rather than making sweeping inferences about defendant's character and resulting conduct.

Having provided that brief overview of the considerations that lead us to conclude that any error was harmless, we now expound on each one.

*First*, this was a bench trial, and the trial court essentially instructed itself not to consider any prior-acts evidence as character evidence. Even if the court was mistaken in concluding that the evidence regarding B had some relevance to motive, it does not necessarily follow that, once the evidence was admitted, the court improperly considered it as propensity evidence. Defendant argues that any erroneous admission was not harmless because the court may have relied on the evidence "to make impermissible

inferences that defendant was likely to have committed the crimes against [A] because he had a propensity for domestic violence in his past." But the court expressly denied the state's request to admit the evidence as character evidence under OEC 404(4), indicating that it likely would not survive OEC 403 balancing if admitted for that purpose, and, at the beginning of B's testimony, it revisited and maintained that ruling. Although it is possible that the trial court conflated motive with character in admitting the evidence at all, that is not the only explanation for any error in admitting it, and the specificity of the court's ruling on the character issue is at least some indication of harmlessness. We generally presume that trial courts follow their own rulings. *See State v. Colby*, 295 Or App 246, 252, 433 P3d 447 (2018) (a trial court's self-instructions in a bench trial are comparable to jury instructions).[3]

*Second*, B's testimony undoubtedly placed defendant in a very poor light. B testified about their three-year relationship, which began when she was 18 years old and lasted from 1988 to 1991. B testified that defendant became increasingly jealous and accusatory over time and often accused her of having affairs. She gave examples of defendant accusing B's landlord of having an affair with B and getting into a fight with him, which resulted in B's eviction, and defendant coming to her workplace and accusing her of having affairs with co-workers, which resulted in B losing her job. She testified that defendant was verbally abusive and controlling, including timing her absences from the apartment, accusing her of cheating on him if she was gone longer than he thought necessary, and sleeping in front of the door with a gun to prevent her from leaving or answering the door. She testified that defendant threatened her on multiple occasions, including holding a gun to her head, pointing a gun at her and their three young children, and,

---

[3] Relatedly, when a case is tried to the bench, we presume that the trial court will make its decision based on the trial evidence, even if it is aware of a particular defendant's criminal history from other proceedings, or even if it has been exposed to evidence of a defendant's uncharged prior bad acts in pretrial hearings. That is, trial judges are often in the position of having to consciously disregard propensity information and the propensity aspects of evidence to conduct a fair trial, and we necessarily rely on their having the training and discipline to do so.

after she got a restraining order, breaking in and threatening to kill her. B also testified to physical violence, including forced sex that resulted in a pregnancy, and a shove and a punch in the stomach when she was five months pregnant.

There is no question that such evidence, to the extent the trial court found it credible, reflected very poorly on defendant. At the same time, defendant's relationship with B had ended 25 years before trial, and the unchallenged evidence of defendant's prior bad acts against *A herself* was both more extensive and more recent than the evidence of prior bad acts against B. There is little purpose in describing all of that evidence in detail—which was submitted over the course of a seven-day trial—but suffice it to say that there was extensive evidence that defendant had physically, verbally, and emotionally abused A on a regular basis throughout their nearly 10-year relationship, including evidence of numerous uncharged acts of domestic violence against A. In deciding whether there is little likelihood that an error in admitting evidence affected the verdict, "we assess any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." *State v. Nguyen*, 293 Or App 492, 499, 429 P3d 410 (2018) (internal quotation marks omitted). Here, even if the trial court theoretically improperly considered A's testimony as evidence of his propensity to commit domestic violence, there was stronger, more current evidence of defendant's propensity to commit domestic violence against A in particular.

*Third*, how the parties actually used the challenged evidence at trial is a factor in determining whether any error in admitting that evidence was harmless. *E.g.*, *State v. Wood*, 253 Or App 97, 289 P3d 348 (2012) (holding that error in admitting statements was not harmless, in a bench trial, where the disputed statements were among the first that the victim made about the alleged abuse, the state emphasized those statements in its closing statement, and they were corroborated by another witness in a way that appeared influential to the trier of fact). In this case, although B's testimony was by no means insignificant in duration or content, it was a relatively small part of a lengthy trial. Moreover, the trial court had indicated during pretrial that it was not predisposed to give much weight to evidence of defendant's

long-ago domestic violence against other women, even as relevant to hostile motive, characterizing it as just "one person's testimony against another."

At trial, with respect to defendant's prior domestic violence against other woman, the state put on evidence only regarding B, and it consistently tied that evidence to its motive theory. In opening statement, the prosecutor described B's expected testimony near the end of a long opening statement that until then had focused entirely on defendant's alleged conduct toward A. The prosecutor said that B would testify to physical, sexual, emotional, and psychological abuse while she dated defendant from 1988 to 1991 and had three children with him; gave two one-sentence examples of B getting evicted and fired due to defendant's jealousy and cheating accusations; and argued that "he did it all, as he did with [A], to control her and to exact whatever revenge he felt he needed to for wrongs that had always been committed against him." Similarly, in closing, the state argued that defendant sought to make intimate partners pay for cheating on him, or for the risk that they might cheat on him, with beatings, abuse, threats, and intimidation, and that "you have seen this motive, not only through the relationship with [A], you saw it with [B]." Although B's testimony was certainly part of the state's case, the state did not rely heavily on it in its arguments to the court, and it consistently tied that evidence to motive arguments.

*Fourth*, there was overwhelming evidence of the charged crimes, including numerous corroborating witnesses, medical evidence, and physical evidence. In evaluating harmlessness, we focus "on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *Davis*, 336 Or at 32. Although we do not independently weigh the evidence, we nonetheless "consider[] the significance of challenged evidence in light of the presence or absence of other overwhelming evidence of a defendant's guilt," recognizing that "the less substantial the evidence of guilt, the more likely it is that an error affected the result." *State v. Dowty*, 299 Or App 762, 773, 452 P3d 983 (2019) (internal citations and quotation marks omitted).

Defendant's trial was not a one-on-one credibility contest between him and A. *See State v. Mackey*, 290 Or App 272, 280, 414 P3d 443, *adh'd to as modified on recons*, 293 Or App 559, 429 P3d 748 (2018) (erroneous exclusion of evidence was not harmless in a case that "largely came down to a credibility contest between the victim and defendant"). The state presented a total of 30 witnesses. Many witnesses corroborated A's testimony, both as to defendant's abuse generally and as to specific incidents, including friends, neighbors, coworkers, and defendant's son M. Defendant's and A's young daughters corroborated hearing fighting, hearing A telling defendant to stop, and seeing defendant with a gun. There was medical and psychological evidence. There was also physical evidence, such as photographs of injuries, evidence of bullet holes from defendant and A's bedroom, and zip ties found in defendant's truck.

*Fifth*, although a relatively minor consideration, the fact that the trial court ultimately found defendant guilty of only 16 of the 28 charged crimes, one being a lesser included offense of the charged crime, is at least some indication that the court carefully considered whether the state had met its burden of proof as to each charged crime, rather than painting with a broad brush because it viewed defendant as having a bad character.

Given all of the foregoing considerations, any error in admitting B's testimony was harmless. In so concluding, we do not underestimate the potential prejudice of evidence of uncharged prior bad acts. Indeed, it is the rare case in which evidence like B's testimony could be improperly admitted with little likelihood of affecting the verdict or judgment. Upon review of the entire record, however, this is such a case. We therefore reject defendant's third assignment of error.

MOTION FOR JUDGMENT OF ACQUITTAL

The final issue is whether the trial court erred when it denied defendant's motion for judgment of acquittal on Counts 15 and 18, two of the UUW charges.

As relevant to Counts 15 and 18, "[a] person commits the crime of unlawful use of a weapon if the person * * *

[i]ntentionally discharges a firearm \* \* \* *within residential areas within urban growth boundaries* at or in the direction of any person \* \* \* without having legal authority for such discharge." ORS 166.220(1)(b) (emphasis added). Defendant argues that the state presented insufficient evidence to convict him because, although there was evidence that defendant discharged a firearm without legal authority at his house in a residential area, there was no evidence that his house was located within an urban growth boundary.

The state responds that the trial court correctly denied defendant's motion for judgment of acquittal, because he was really challenging the sufficiency of the indictment, which is a challenge that must be brought by demurrer. *See* ORS 135.630(4) ("The defendant may demur to the accusatory instrument when it appears upon thereof \* \* \* [t]hat the facts stated do not constitute an offense."). The state notes that the indictment in this case is deficient in that it omits the "within urban growth boundaries" element of the UUW offense. *See State v. Samuel*, 289 Or App 618, 627, 410 P3d 275 (2017) (an element is material to the offense if the indictment does not state an offense without it). As to both Counts 15 and 18, the indictment alleges that defendant, "on or between the 1st day of January 2014 and the 1st day of April 2015, in Deschutes County, Oregon, did unlawfully and intentionally discharge a fireman *within a residential area* \* \* \* at or in the direction of [A] within the range of such discharge." (Emphasis added.) The state argues, essentially, that defendant had to demur to raise that issue and could not raise it in a motion for judgment of acquittal.

The state relies on *State v. Hankins*, 342 Or 258, 151 P3d 149 (2007). In that case, the defendant was indicted and tried on four counts of felony delivering marijuana to a minor in violation of *former* ORS 475.995(5) (1999). As to each count, the indictment charged that the defendant "did unlawfully and knowingly deliver a controlled substance, marijuana, to a person under 18 years of age." *Hankins*, 342 Or at 261. At the close of the state's case, the defendant moved for judgment of acquittal, arguing that the indictment was deficient "because it failed to allege that he was 18 years of age or older and that the victim was at least three

years younger than he was," as required for the charged crime. *Id*. The trial court denied the motion on the basis that there was sufficient evidence for a reasonable jury to find that defendant was 18 years of age or older and that the victim was at least three years younger than him. *Id*.

"When [the defendant in *Hankins*] objected that he was challenging the sufficiency of the *indictment*, not the sufficiency of the evidence, the trial court explained that a demurrer was the proper way to challenge the sufficiency of an indictment." *Id*. (emphasis added). We affirmed the denial of the motion for judgment of acquittal, and the Supreme Court affirmed. *Id*. at 266-67. As explained in *Hankins*, when a defendant moves during trial for judgment of acquittal based on an insufficiency of the *indictment*, and the trial court declines to allow it as a late demurrer, the motion should be treated as a premature motion in arrest of judgment, denied with leave to renew after verdict, and then addressed on the merits in the event that the defendant is convicted. *Id*. at 265 (relying on *State v. McKenzie*, 307 Or 554, 561, 771 P2d 264 (1989)). The trial court therefore did not err in denying the motion for judgment of acquittal in *Hankins*, as that was not the correct vehicle for a challenge to the sufficiency of the indictment. *Id*. at 266-67. Notably, the trial court did instruct the jury on the element missing from the indictment (regarding the defendant's and the victim's ages), and the defendant did not contest the sufficiency of the state's evidence at trial on that element. *Id*. at 261-62 n 6.

Unlike the situation in *Hankins*, defendant in this case unequivocally challenged the sufficiency of the *evidence*, not the sufficiency of the indictment. Moreover, the state does not contest that the evidence was insufficient to prove that the discharge alleged in Counts 15 and 18 occurred "within urban growth boundaries." ORS 166.220(1)(b). A motion for judgment of acquittal is precisely the correct vehicle to challenge the sufficiency of the evidence. *See* ORS 136.445 ("In any criminal action the defendant may, after close of the state's evidence or of all the evidence, move the court for a judgment of acquittal. The court shall grant the motion if the evidence introduced theretofore is such as would not support a verdict against the defendant."); *City of*

*Portland v. Miller*, 62 Or App 145, 147, 659 P2d 980 (1983) (a motion for judgment of acquittal "tests the sufficiency of the evidence to support a verdict"); *see also State v. Mayer*, 146 Or App 86, 89, 932 P2d 570 (1997) ("'Insufficiency of evidence' is not a legitimate ground for a motion in arrest of judgment[.]").

The only question here is whether the omission of the "urban growth boundary" element from the indictment *excused* the state from proving that element, thus defeating the motion for judgment of acquittal. Neither party squarely addresses that issue on appeal. However, we are not aware of any authority that would allow defendant to be convicted, notwithstanding an absence of evidence on a material element, on the sole basis that that element was omitted from the charging instrument. Rather, it is our understanding that, even if the defendant does not move against an accusatory instrument as asserting facts that do not constitute an offense, the state still needs to prove facts sufficient to support a verdict on the charged crime. Thus, for example, the defendant in *Hankins* was convicted on sufficient evidence, even though the indictment was deficient on its face. *See Hankins*, 342 Or at 261-62 n 6.

It follows that defendant was entitled to judgment of acquittal on Counts 15 and 18, given the lack of evidence that the unlawful use of a weapon occurred "within urban growth boundaries." ORS 166.220(1)(b). Although defendant could have demurred or moved in arrest of judgment based on the pleading deficiency, we see no reason that he had to do so, if he preferred to test the state's evidence instead of challenging the indictment on procedural grounds. The trial court therefore erred in denying defendant's motion for judgment of acquittal on Counts 15 and 18.

Convictions on Counts 15 and 18 reversed; remanded for resentencing; otherwise affirmed.